## AMELIA NICHOLAS, Appellant, v. EVANGELICAL DEACONESS HOME & HOSPITAL

### Division One, March 2, 1920.

1. **CHARITY: Shown by Articles: Parol Evidence.** An association whose purposes are to nurse the sick and establish and support a home where deaconesses are to be educated and trained to serve as nurses for sick and aged persons admitted to the home, whose members are required to believe in the creed of the Apostles and are to pay annual dues and receive no dividends or compensation, and whose directors have no power to distribute funds to its members as profits or otherwise, but only to use them to carry out its charitable and benevolent objects, is a charitable association. And all these facts appearing from its articles of association, parol evidence to show its charitable character is not necessary, but evidence to the effect that its funds, whether received from dues or donations or derived from pay patients, were held in trust for the charitable and benevolent purposes of the organization, does not destroy or alter its character as a charity.

2. ————:**Personal Injury to Patient: Recovery of Damages.** A charitable association is not liable in damages for personal injuries to its patients caused by the negligence of its trustees, servants or employees. The funds of a charitable hospital or association are trust funds devoted to the alleviation of human suffering, and cannot be diverted or absorbed by claims arising from the negligence of the trustees or employees.

3. ————: ————: ————: **Pay Patient.** The fact that the patient at the hospital for the charitable association was not a charity patient, but paid for all the services rendered by the nurses and for the medicines and supplies furnished by the association, does not entitle her to recover damages for injuries caused by the negligent application by a nurse of carbolic acid, instead of alcohol, to her skin, during the course of a massage prescribed by her physician.

Appeal from St. Louis City Circuit Court.—*Hon. Thomas C. Hennings,* Judge.

AFFIRMED.

Nicholas v. Evangelical Deaconess Home.

*Jourdan, Rassieur & Pierce* for appellant.

(1) Where one is permitted, temporarily in the absence of the regular servant or agent, to take the place and charge of matters committed to such absent agent or servant, he has for the time being the same authority as if he were the regular agent or servant. 21 R. C. L. sec. 34, pp. 855-856; Storage Co. v. Cox, 74 Ohio St. 284, 78 N. E. 371. (2) The owner of a grocery store or retail business (or a drug store, as at bar) placing another in charge thereof is held to have authorized such person so placed in charge to make sales and dispense the goods (or drugs) in the usual course of business. Henson v. Keet & Rountree Mer. Co., 48 Mo. App. 214. (3) In determining whether plaintiff should be non-suited the testimony must be viewed in the most favorable aspect for plaintiff. This deprives the defendant of the right to urge on the court that it assume a fact or facts to exist upon which there is a complete absence of evidence.

*Watts, Gentry & Lee* for respondent.

(1) The judgment should be affirmed, because the relation of master and servant was not shown to exist between the respondent and any person who committed any negligent act which resulted in injury to the plaintiff. The burden was upon the appellant to make that proof, and, the appellant having wholly failed to do so, the judgment should be affirmed, regardless of the question as to whether or not respondent is exempt from damages for its servants' acts because it is a charitable institution. At best, plaintiff's evidence leaves it in doubt and uncertainty whether the injury resulted from negligence of an employee or that of a person who was not an employee. The cause being left to speculation, a demurrer to the evidence was properly sustained. Goransson v. Ritter Co., 186 Mo. 300; Kane v. Railroad, 251 Mo. 30; Caenefielt v. Bush, 198 Mo. App. 491. (2) The respondent was shown by undisputed documentary evidence, to be a

charitable institution, and, under the law of this State, and under the great weight of authority in other states, and in England, a charitable hospitable is not liable for the torts of its servants committed in the treatment of patients.   Therefore, even if the plaintiff had been injured by a negligent act of some servant of the respondent, while engaged in the line of his or her duty, there would still be no right of recovery.   The fact that many patients paid for the privileges of the hospital, or the fact that in one year some surplus was left after the expenses were paid, does not change the institution from a charitable one to a business corporation.   Adams v. University Hospital, 122 Mo. App. 675;   Whittaker v. St. Luke's Hospital, 137 Mo. App. 116;   Powers v. Mass. Homeopathic Hospital, 109 Fed. 294; McDonald v. Mass. General Hospital, 21 Am. Rep. 539;   Benton v. Boston City Hospital, 140 Mass. 13, 54 Am. Rep. 431; Downs v. Harper Hospital, 101 Mich. 555, 45 Am. St. 427; Hospital v. Ross, 12 Clark & F. 507;   Gooch v. Association, 109 Mass. 508;   Cunningham v. The Sheltering Arms, 119 N. Y. Supp. 1033;   Collins v. New York Post Grad. Med. Hospital, 89 N. Y. Supp. 106;   Wilson v. Brooklyn Homeopathic Hospital, 89 N. Y. Supp. 619; Pephe v. Grace, 130 Mich. 493;   Parks v. N. W. University, 121 Ill. App. 512, 218 Ill. 381, 2 L. R. A. (N. S.) 556; Hearns v. Waterbury Hospital, 66 Conn. 98; Schloendorff v. Society of New York Hospital, 211 N. Y. 125, 52 L. R. A. (N. S.) 505;  People ex rel. v. Society of New York Hospital v. Purdy, 58 Hun 386, 12 N. Y. Supp. 307, 126 N. Y. 679;   Hodern v. Salvation Army, 139 Am. St. 899; Taylor v. Protestant Hospital Assn., 85 Ohio St. 90, 30 L. R. A. (N. S.) 427;  Hill v. Tualatin Academy, 61 Ore. 190;  Duncan v. Nebraska Sanitarium Benv. Assn., 41 L. R. A. (N. S.) 973.

SMALL, C.—Appeal from the Circuit Court of the City of St. Louis.   This is a suit for personal injuries sustained by the plaintiff from having received a massage with carbolic acid instead of alcohol at the hospital of the defendant.   The petition is as follows:

"Plaintiff states that defendant is, and at all of the time herein stated was, a corporation existing under the laws of the State of Missouri, located and doing business in the City of St. Louis and maintaining and operating a hospital for the care and treatment of the sick.

"Plaintiff states that heretofore, to-wit, during January and February, 1914, she was sick and a patient at said hospital of defendant, and that part of the treatment administered to her consisted of daily alcohol rubbings or massages by one of the attending nurses.

"And plaintiff states that on, to-wit, the 2nd day of February, 1914, one of said nurses, desiring an additional supply of alcohol, applied to the proper representative and attendant of defendant therefor, said representative being one of the internes at defendant's said hospital, and that such representative carelessly and negligently filled up the bottle of the nurse with carbolic acid instead of alcohol.

"That owing to the similarity in appearance, such substitution was not discovered by such nurse, and that thereafter the nurse undertook to give plaintiff the usual alcohol rub or massage, and in consequence of the action aforesaid of defendant, through its said representative, in filling the bottle used by the nurse with carbolic acid instead of with alcohol, a large quantity of carbolic acid was poured on and against the back of this plaintiff, severely burning and injuring and wounding her and causing intense physical pain and mental anguish and suffering.

"Plaintiff states that she still suffers the effects of said carbolic-acid burns and wounds, and that in all probability she will continue to suffer therefrom permanently hereafter.

"That by reason of the premises she has been damaged in the sum of ten thousand dollars, for which, with costs, she prays judgment against defendant."

The answer was as follows:

"Comes now the defendant, the Deaconess Hospital, and for answer to the plaintiff's petition herein, says:

"That it, said defendant, is an eleemosynary corporation, organized and doing business under and by virtue of the laws of the State of Missouri, and created and existing particularly under and by virtue of the provisions of the statute as shown in Article 10, Chapter 33, Revised Statutes of Missouri 1909, entitled, 'Benevolent, Religious, Scientific, Educational and Miscellaneous Associations;' that said defendant corporation is a benevolent and charitable association or corporation and is not incorporated for profit; and that by reason of the premises defendant is not liable for the alleged or pretended injuries described in the plaintiff's petition.

"And said defendant for further answer denies each and every allegation in said petition contained.

"Wherefore, said defendant having fully answered, asks to be dimissed with its costs in this behalf most wrongfully sustained."

The reply was a general denial. The plaintiff's testimony tended to show the following state of facts:

The plaintiff, a married lady, living in St. Louis, being ill in January, 1914, was attended by Dr. Francis Reder, as her physician. At his suggestion on January 21, 1914, she went to the hospital of the defendant and remained there until February 28, 1914, and was there attended by her said physician. She employed and paid two special nurses, Beatrice Francis by day and Anna Schmidt by night. For her room and board at the hospital she paid defendant $15 a week. The hospital had a pharmacy at which she purchased bandages, medicines and alcohol, for which she paid. She paid each of her nurses $25 per week, and paid the hospital $7 a week for the board of each nurse. She also paid Dr. Reder who attended her. She received no free treatment, medicines, or attention whatever, but, as far as the evidence shows, she paid the full regular price for all she received at the hospital. About midnight, February 2, 1914, her night nurse, Miss Schmidt, undertook to massage the plaintiff's back with alcohol, as she had done before, in pursuance of instructions from Dr. Reder. The nurse poured something

into her hand out of a bottle and applied it to plaintiff's bare back, and as the nurse did so, the plaintiff gave out a scream and the nurse said: "My God! It is carbolic acid I have used." The plaintiff was severely burned by the acid. The nurse's hands were also burned.

In addition to the expenses already mentioned, the plaintiff paid the hospital for the use of the operating room for two operations performed upon her, $5 for the first operation, and $10 for the second.

The night nurse, Miss Schmidt, did not testify, nor was her deposition taken. At the time of the trial she resided at Cairo, Illinois.

The day nurse, Miss Francis, testified that on the day plaintiff was injured, she was on duty, her hours being from seven in the morning until seven in the evening, and Miss Schmidt's from seven in the evening until seven in the morning. That she used alcohol for "rubs" which she gave the plaintiff; that she got the alcohol at the drug department at the hospital in an eight-ounce bottle marked, "Alcohol." On February 2, 1914, the day plaintiff was burned, she took this bottle to the hospital pharmacy to get it filled with alcohol. The druggist was off duty and she testifies: "Dr. Young, the interne or house physician, had charge of the drugs. I asked him for alcohol, and handed him the bottle. He filled it with something which had the same color as alcohol. It was light in appearance. I took it to the plaintiff's room and put it on the dresser in its usual place. I did all in the usual way. Alcohol and carbolic acid resemble each other very much in looks. When I left duty that evening Mrs. Nicholas had no burns on her person. I saw her again the next morning between seven and eight o'clock, and her whole back was burned by carbolic acid. I could tell that by the color of the burns and the odor of what was in the bottle. I did not know at the time that Dr. Young had put carbolic acid in the bottle."

For defendant, Dr. Francis Reder, testified that plaintiff's burns were superficial, except near the lower part of the spine, where they were deeper than superficial. He spoke to Sister Magdelane about the nurses

for the plaintiff, and she assigned Miss Francis and Miss Schmidt. He prescribed alcohol rubs and not carbolic acid. Plaintiff was burned with carbolic acid.

Defendant was incorporated by a decree of the Circuit Court of the City of St. Louis March 18, 1891, in which the court adjudged that its articles of agreement "come properly within the purview of Article X, of Chapter 42, R. S. Mo. 1889," relating to Benevolent, Religious, Fraternal, Beneficial, etc., Associations. The articles of association of defendant, which were executed by seventy citizens of St. Louis, together with the decree of incorporation, were introduced in evidence by the defendant. The object and membership of the association are therein stated, as follows:

"Article II. Object. It is the object of this association: 1st. To nurse the sick and to exercise care for poor and aged by deaconesses, i. e. theoretically and practically trained Christian nurses. 2nd. To found and support a deaconess home where deaconesses shall be educated and trained, and from which they shall be sent as nurses, and where sick and aged, under circumstances provided by By-laws, may be admitted and receive attendance.

"Article III. Membership. 1st. Every Protestant Christian whose belief is in conformity with the creed of the apostles, and who agrees to fulfill the regulations of this association, is welcome as a member. 2nd. The duties of members are: a. To attend the meetings of the association as regularly as possible. b. To be active for the growth and promulgation of the association. c. To pay in advance an annual fee of at least two dollars. 3rd. Any person, being proposed in writing by a member, may become a member of the association if admitted by a vote of a majority of the board of directors."

Among other things, Article VI provided for annual meetings, and stated: "This meeting shall be of a religious character in which deaconess work shall be set forth by one or more speeches . . . 4th. Every

meeting shall be opened and dismissed with prayer and conducted in a manner corresponding to the Christian charity work of this association."

Article IV provided: "The management of this association shall be by a board of directors consisting of twelve persons," four ministers, four laymen and four ladies, who shall have been members of the association at least one year.

Article V provided for a president, vice-president, recording secretary, secretary of finance, and a treasurer. The secretary of finance was required to collect the dues of the members and turn over the money to the treasurer. The treasurer was made custodian of the association's funds and was required to execute bond at the option of the directors that he "will faithfully fulfill the duties of his office and account for and pay over as directed by the board of directors, all funds which may come into his hands. He shall keep an account of receipts and expenditures and make payments only when orders for the same carry the joint signatures of the president and recording secretary, and at the termination of the year he shall submit a statement of finance to the board of directors." A home committee chosen from the board of directors was provided for, who, with others, should examine all applications for admittance to the Deaconess Home and then submit the same to the board of directors for decision.

The manager of the hospital testified for defendant that the funds of the hospital were derived from dues of members, donations from churches and private persons, and from the Hospital Saturday and Sunday Association, also from pay patients. Patients who do not pay were also received. In 1914 there were 395 free patients, and 1521 pay patients. The money of the association was expended under his supervision. It was paid out for salaries, medicines and for operating the hospital. They always had some charity patients. There were no dividends paid and no salaries, except to those in the hospital. They took patients whether such

patients could pay or not, and they had the benefit of the medicines and nursing, and if admitted as charity patients were not expected to pay. The superintendent or manager received a salary of $1400 per annum. The house physician received $50 per month and room and board. The deaconesses received no salaries, but they got a monthly allowance of pocket money. The income for the year ending September 30, 1914, was from pay patients $60,387.45, including sums paid for drugs, dressing and operating room; income from other sources, including membership dues and donations, was $5,844.42. Total expenditures during the same time in operating and maintaining the hospital, was $62,021.29. The excess of income over expenditures was $4,210.58. A statement was also put in evidence showing that defendant owned a building, furniture and equipment worth $158,012.77, and accounts receivable and supplies on hand $8,090.07, and was owing $14,362.74.

Dr. Young, who Miss Francis testified, was in charge of the pharmacy department in the absence of the druggist and was an interne or house physician at the hospital, and who filled the bottle for her, as she thought, with alcohol, was not called as a witness, nor did he testify by deposition.

At the close of all the evidence, the court, at the instance of defendant, sustained a demurrer to the evidence. The jury rendered a verdict for the defendant, and the plaintiff brought the case here by appeal.

I. We hold that defendant under its articles of association is a charitable organization. The purposes of its organization are: "1st. To nurse the sick and to exercise care for poor and aged by deaconesses, i. e. theoretically and practically trained Christian nurses. 2nd. To found and support a deaconess home, where deaconesses shall be educated and trained, and from which they shall be sent as nurses, and where sick and aged persons, under circumstances provided by By-laws, may be admitted and receive attendance." The members were required to be

*Charitable Association.*

Protestant Christians, whose belief is in conformity with the creed of the apostles, and they were to attend the meetings of the association as regularly as possible and be active for its growth. Every meeting was required to be opened and dismissed with prayer and conducted in a manner corresponding to the Christian charity work of the association. There were no shares of stock, no provision for making any profits for its members; but, on the other hand, each member was required to pay two dollars annual dues to support the association. It is true, there was a board of directors, composed of ministers, laymen and ladies, who had the management of the association and the disposition of its funds; but this was not intended to give the power to the board to distribute any funds to its members as profits, or otherwise, but to manage and dispose of its funds to carry out the benevolent and charitable objects of its incorporation. The owners of the corporation, i. e., its members, could receive no personal benefit or advantage whatever from their connection with the association, save the satisfaction that comes to human beings from doing or attempting to do something to relieve the sick and the suffering. The services rendered by the members in promoting the growth of the association, managing the hospital and deaconess home, were furnished *gratis,* and so were the funds they paid in as dues. The charitable character of the defendant clearly appears from its articles of association, wherein its work is expressly referred to as Christian charity work, and was, therefore, for the court to pass upon, and not for the jury.

The parol evidence introduced by the defendant was not necessary to show defendant's charitable character, but it did not disprove it. The fact that a large part of its revenue was derived from pay patients, in no wise destroyed defendant's character as a charity, because, such funds, as well as those received from dues and donations, were held in trust by it for the charitable and benevolent purposes of its organization. [Adams v. University Hospital, 122 Mo. App. 675, l. c. 687-8;

Whittaker v. St. Luke's Hospital, 137 Mo. App. 116; Powers v. Mass. Homeopathic Hospital, 109 Fed. 294; McDonald v. Mass. General Hospital, 120 Mass. 432; Gable v. Sisters of St. Francis, 227 Pa. St. 254; Jensen v. Maine Eye & Ear Inf., 107 Me. 408; Downes v. Harper Hospital, 101 Mich. 555; Hospital v. Ross, 12 Clark & F. 507; Cunningham v. The Sheltering Arms, 119 N. Y. Supp. 1033; Pepke v. Grace Hospital, 130 Mich. 493; Parks v. N. W. University, 218 Ill. 381, 2 L. R. A. (N. S.) 556; Hearns v. Waterbury Hospital, 66 Conn. 98; Schloendorff v. Society of New York Hospital, 211 N. Y. 125, 52 L. R. A. (N. S.) 505; Hordern v. Salvation Army, 139 Am. St. 889; Taylor v. Protestant Hospital Assn., 85 Ohio St. 90; Duncan v. Nebraska Sanitarium Benev. Assn., 41 L. R. A. (N. S.) 973; and 6 Cyc. p. 974; Wharton v. Warner, 135 Pac. (Wash.) 235; Abston v. Waldon Academy, 118 Tenn. 24; St. Paul's Sanitarium v. Williamson, 164 S. W. (Tex.) 39; Fordyce v. Woman's Natl. Lib. Assn., 79 Ark. 550.]

II. The defendant being a charitable organization, is not liable for injuries caused to its patients by the negligence of its trustees, servants or employees. Authorities, supra.

**Liability for Negligence.**

In none of the decisions above noted is the exemption of charitable institutions from the rule of *respondeat superior* more clearly and satisfactorily set forth than in the two opinions from our own Courts of Appeal to which we have referred. In Adams v. University Hospital, 122 Mo. App. 675, ELLISON, J., delivering the unanimous opinion of the court, cites and reviews, *in extenso,* the decisions in this country and in England, and shows that ever since the decision of the House of Lords, in the case of Heriot's Hospital v. Ross, 12 Clark & F. 507, the law has been firmly established by the great weight of authority, that the funds of a charitable hospital or association are trust funds devoted to the alleviation of human suffering, and cannot be diverted nor absorbed by claims arising

from the negligence of the trustees or their employees in administering the trust or charity. In Whittaker v. Hospital, 137 Mo. App. 116, Goode, J., delivering the opinion of the court, again thoroughly examines and considers the question and thus announces the law (l. c. 129) : "Two rules of law, both founded on motives of public policy, come into conflict here; the rule of *respondeat superior* (or if not technically that, one akin to it) and the rule exempting charitable funds from executions for damages on account of the misconduct of trustees and servants. As both rules rest on the same foundation of public policy, the question is whether, on the facts in hand, the public interest will best be sub-served by applying the doctrine of *respondeat superior* to the charity, or the doctrine of immunity; and we decided this cause for respondent because, in our opinion, it will be more useful on the whole not to allow charitable funds to be diverted to pay damages in such a case; and, moreover, the weight of authority is in favor of this view, as expressed not only in cases where the party seeking damages were patients in the institution, but where they were not."

We are satisfied with these pronouncements of our Courts of Appeals, and hold that they announce the true rule of law to be applied in such cases.

III. But, it is urged, that the plaintiff in this case was not a charity patient, and that she paid for all the services rendered and supplies and medicines furnished her by the defendant. This was also true in all of the many cases cited (except three or four), supra, but this fact was held immaterial and to give the plaintiff no greater right to divert a trust fund, than if she had been a charity patient. On this phase of the case, in Adams v. University Hospital, 122 Mo. App. l. c. 679-80 (in which case the plaintiff was a pay patient), the court says:

Pay Patient.

"So it may be said that any citizen who accepts the service of such institution (it making no difference

13—281 Mo.

whether in a special instance he pays his way) does so upon the ground, or the implied assurance, that he will assert no complaint which has for its object, or perhaps we should say, for its result, a total or partial destruction of the institution itself.''

Many of the cases cited from other states, supra, place their ruling on the same ground. Others give the reason, as stated by the New York Court of Appeals, in Schloendorff v. Society of N. Y. Hospital, 211 N. Y. l. c. 129: "Such payment is regarded as a contribution to the income of the hospital, to be devoted like its other funds, to the maintenance of the charity.''

But they all agree that a pay patient stands on the same footing and no better, than a patient that does not pay.

IV. There is nothing contrary to the conclusion we have reached, in Phillips v. Railroad Co., 211 Mo. 419, or Brennan v. Cabanne Methodist Episcopal Church, 192 S. W. 982. In the Phillips case—not the hospital, but the railroad company itself was sued—and this court held the railroad company liable for the negligent treatment of a patient by a physician at the hospital, on the ground that the railroad company substantially operated and maintained the hospital, not as a charity, but, in effect, for its own purpose and protection, and the hospital association was the mere agent of the railroad company. In the case of Brennan, the plaintiff alleged that he was injured by a negligent defect in a building owned by defendant, which it used for religious and "*other public assemblages.*" The lower court sustained a demurrer. We held it erred in so doing, because the petition showed the defendant might own property to be used for divers purposes not charitable nor religious, although organized under the Benevolent Association Act, and the petition alleged that defendant's house was, in fact, used for more than religious purposes. We said, 192 S. W. l. c. 984:

"If the defendant desires the court to pass upon the question as to whether or not a religious corporation is

*Distinction.*

a charitable organization, which is not liable, it will have to get the matter here in such shape that such will be the question for actual determination.''

In the case at bar, the introduction in evidence of the defendant's articles of association and decree of incorporation brings the question as to the charitable character of defendant and the use of its property as a hospital, fairly before us for actual determination, and we have determined that under its articles it is a charitable institution, and there is nothing shown by the oral testimony that in its actual operation and management it in any way departs from the charitable character and purpose of its organization, as shown by its articles of association.

There are other questions suggested in the very able briefs of counsel on each side, which, however, it is not necessary to determine.

The result is, we concur in the ruling of the circuit court. Let the judgment be affirmed. *Brown* and *Ragland, CC.,* concur.

PER CURIAM:—The foregoing opinion of SMALL, C., is adopted as the opinion of the court. All of the judges concur.