STEELE et ux. v. ST. JOSEPH'S HOSPITAL.
No. 12833.

Court of Civil Appeals of Texas.
Fort Worth.
April 29, 1933.

Rehearing Denied May 20, 1933.

Templeton & Templeton, of Fort Worth, for appellants.

Wren, Pearson & Jeffrey, of Fort Worth, for appellee.

CONNER, Chief Justice.

This appeal is from a directed verdict and judgment against the appellants, W. H. Steele and wife, in a suit by them against the appellee, St. Joseph's Hospital, of Fort Worth, to recover damages resulting to Mrs. Steele from an alleged serious burn on one of her limbs caused by a hot water bottle left in a bed upon which she was confined while unconscious and a patient in appellee's hospital.

The appellee denied the alleged negligence of its servants and employees, and specially alleged that it was an incorporated charity and that it had exercised due care in the selection and retention of the employees whose actions were complained of and hence exempt of all liability.

The evidence shows that about the 1st of April, 1931, Mrs. Steele was suffering from an acute attack of appendicitis and taken to the appellee hospital for the purpose of an operation. By the hospital operatives she was placed in a room from which soon thereafter she was taken to the operating room, where she was kept about an hour and returned to her room and placed in bed; that while yet unconscious she was, according to her testimony, seriously burned on her right lower limb, from which she suffered much pain, loss of time, etc. She called as witnesses in her behalf Sister Mary Albertine, Miss Nina B. Wales, Miss Iva Dillingham, Mrs. W. A. Buckner, and Miss Agnes Stultz. The testimony of these witnesses is in Q. and A. form, and because of its volume we will only undertake to give a substantial outline of it to the end that the issues made by the pleadings and the evidence and our conclusions may be fairly understood.

Sister Mary Albertine, among other things, testified that she was the supervisor of the floor on which the operation was performed; that her duties were to see that the doctors' orders were carried out by the nurses and that the nurses attended the patients; that Mrs. Steele came to the hospital early in the evening and was attended by the operating room nurses; that she was taken from the operating room about 6:40 p. m. and returned to the room in which she was first placed; that in preparing the bed under the rules of the hospital two hot water bottles had been placed therein to warm it because of the lowered vitality of patients who had been anesthetized; that she did not know who so placed the bottles, which had been done under general orders, but she saw them placed in the bed before the patient came back; that they were covered with flannel blankets and she felt them and they were not too hot; that she came into the room soon after Mrs. Steele had been returned from the operating room and saw that one of the bottles had been taken out, and looked for the other, but failed to find it; that she turned the patient over and felt under the cover from her hips down, but did not take the covers off on account of the condition of the patient; that she thought the bottle would be pretty cold and made no further examination; it was supposed to have been kicked to the foot of the bed; that it was the duty of the nurses who brought Mrs. Steele back to her room from the operating room to remove the bottles; they were Mrs. Buckner, the anesthetist, a registered nurse, Miss Dillingham and Miss Stultz, nurses in training; they simply said they could

not find the other bottle; said the patient became cyanotic in the operating room and almost passed out; that in such cases the patients respiratory system goes bad, they turn blue and cannot breathe, their lungs fill with mucus, and she was in that condition and the nurses were so taken up with getting her to breathe was possibly the reason why the bottle was overlooked; that Miss Dillingham was serving her six months in the operating room, Miss Stultz was taking her surgical experience on that floor; that she (the witness) kept the grades of the student nurses and turned them in to the superintendent the 1st of each month; that the hospital paid the student nurses their wages.

Mrs. Buckner testified that she was the anesthetist, and that it was her duty after administering the anesthetic to see that the patient was returned to the room in proper condition; that Mrs. Steele was in the operating room something over an hour; that she and Miss Dillingham, a student nurse from the operating room, returned Mrs. Steele to her room; that the patient took "a very bad anesthetic all the way through"; that at different intervals she would be cyanotic, which means a lack of oxygen in the blood, and she would turn blue all over, and had to be given oxygen to get her color normal; that just as they started to take Mrs. Steele from the carriage and put her in the bed she began to get cyanotic again and that her attention was given entirely to her; that she remained with Mrs. Steele until a graduate nurse came out with her, a Miss Wales; that she did not know at the time that there was a hot water bottle in the bed, though such was the custom and it is made the duty of all nurses to see that they are out, but that on the occasion in question Mrs. Steele began to get cyanotic again and her attention was given to Mrs. Steele rather than to anything else.

Miss Dillingham testified that she assisted the anesthetist in bringing Mrs. Steele from the operating room; that she had been working in the operating room about two weeks prior thereto in preparing patients for operation; that on the occasion in question she met Mrs. Buckner at the door of the elevator and assisted her in taking the patient to her room and placing her in bed; that she was so acting by the direction of Sister Friediana, in charge of the operating room. That before placing Mrs. Steele in bed she looked and found one hot water bottle but failed to find the other; that she shook the covers or rather felt under them; that the patient was cyanotic and that it was hard for her to get her breath, and that she remained in the room and assisted Mrs. Buckner for some five minutes and then returned to the operating room; that she was a student nurse of three months" standing and had attended classes of instruction given by the doctors and nurses; that she was first instructed in the preparation of

beds, which included putting in and removing hot water bottles.

Miss Agnes Stultz testified that she was a student nurse in the hospital and had been there some six or seven months; that she helped move Mrs. Steele from the carriage and place her in bed by lifting her feet; that Mrs. Steele was unconscious at the time; that as she entered the room she noticed that one of the hot water bottles had been removed but did not look for more, as they were moving the patient from the carriage and she saw only one hot water bottle and presumed that that was all; that any nurse not otherwise engaged looks after the preparation of the beds for an anesthetic patient; that every nurse, except probationists who have been in training under three months, knows the making of an anesthetic bed; that it was the duty of whoever happens to be on the job to look after the patients.

Miss Nina B. Wales testified that she was a graduate nurse called to wait on Mrs. Steele about an hour after her operation; that she found Mrs. Steele unconscious, but that her condition was fair but still under the influence of the anesthetic; that she found and removed the hot water bottle (the one in question); it was not then hot enough to burn flesh; that it was customary to put hot water bottles in the bed to warm it and to remove them before the patient was put in; that the student nurses usually prepare the bed for the patient by the direction of the Sister in charge of the floor, who at the time was Sister Albertina. That on partial recovery from the anesthetic Mrs. Steele complained of hurting on her leg and that she found a red blister on the calf of her right leg about the size "of the palm of my hand."

In behalf of the appellee hospital, its charter from the state of Texas was introduced, and the purpose of the incorporation is thus stated in the charter: "Said corporation is formed for benevolent and charitable purposes, and especially for the erection and maintenance of a hospital in the City of Fort Worth, Texas, at which the members of said corporation will administer to the sick, infirm and afflicted of all creeds and nations, and to enable its members to receive the sick, the helpless and the afflicted, and to nurse and care for them, and to alleviate their pain and suffering and to restore them as far as possible to health."

Sister M. Nativity testified that she was known as Mother Superior of St. Joseph's Hospital; that she had been in Texas more than forty years and was connected with the Sisters of Charity of the Incarnate Word, the organization that sponsors St. Joseph's Hospital; that the hospital was incorporated under the laws of Texas and had been in operation since 1889, the building and equipment being paid for by the income from patients and donations; that the corporation had no

capital , stock—no shareholders—and the members worked without compensation; that she handled the funds that paid for the buildings; that the function of the hospital was to care for patients without restriction as to nationality, religion, or class, or as to whether they pay or not; that they got pay from all the patients able to do so; gave about the same treatment to those unable to pay except there were different classes of rooms but the patients got the benefit of the laboratory, operating room, X-ray, doctors' attention, nurses, all without pay; that the corporation had never made any profit since the new building had been erected in 1926; that they now owed on the building $326,707; that the funds, if any over expenses, are set aside for improvements and had always been; that the moneys received by the hospital were devoted to the purposes of charity of the corporation; that they maintained a training school for nurses; that Sister Arcadis employed the prospective students; that she (the witness) knew nothing of her own knowledge about the particular accident to Mrs. Steele; that on an average they had about 70 pay patients and 6 or 7 charity patients at a time; that "we" control the funds arising from pay patients. "Q. Who is 'we'? A. I am. My control is subject to the approval by higher authorities of the order." That Sister Albertina is a graduate nurse in charge of the floor on which Mrs. Steele was placed; that the nurses under her are mainly student nurses; should one of them be careless or negligent in their duties in any way and it happened too often they would have to dismiss them; that "this would be done by Sister Arcadis if the complaints determined by me were sufficient under the circumstances."

Sister Mary Arcadis testified that she had been in Fort Worth about twelve years the last time and belonged to the same order that Mother Superior did; that she had been in the hospital about four years as superintendent of the nurses; that her duties were to receive the students in training and send them to the various departments in the institution and rotate the service when it called for it during the different months; that she employed and discharged the student nurses after consultation with Mother Superior; that she received Miss Dillingham and Miss Stultz; that they required high school graduates for student nurses; that they must have a pleasing personality and have adaptability for nursing; that they investigate their moral character; that while in training they were under the supervision of a supervisor on each floor who is a registered nurse; that student nurses receive instruction from the doctors and lectures from October until May and have examinations; that their progress was watched by her with the aid of the instructors and nurses; that, if a nurse in training did not respond to her instructions or was guilty of any negligent act, she would be the one to discharge her with the aid of Mother Superior; that student nurses had a preliminary term of four months for intensive instruction; they are first taught to take temperatures and make beds according to technique and to take care of the linens and also hot water bottles and everything of that nature that comes under the preliminary period.

Mrs. Alice Taylor testified in behalf of defendant substantially as the others as to the training of student nurses and that the supervisor on the floor was the one most responsible for the conduct of student nurses in her charge; that supervisors were responsible to the superintendent of nurses; and that superintendent of nurses was directly responsible to the witness.

An interesting history of the development of the rule of exemption under consideration from its English origin to its adoption by the majority of the American courts is given by Judge Hamersley in the case of Hearns v. Waterbury Hospital, reported in 66 Conn. 98, 33 A. 595, 604, 31 L. R. A. 224. That was a case where Hearns had instituted suit against the hospital claimed to be a charitable organization to recover damages for the negligent treatment of a fractured kneecap. Judge Hamersley concludes the review of the cases with the following reasoning and conclusion:

"This defendant does not come within the main reason for the rule of public policy which supports the doctrine of respondeat superior. It derives no benefit from what its servant does, in the sense of that personal and private gain which was the real reason for the rule. Again, so far as the persons injured are concerned, especially if they be patients at the hospital, the defendant does not 'set the whole thing in motion,' in the sense in which that phrase is used as expressing a reason for the rule. Such patient, who may be injured by the wrongful act of a hospital servant, is not a mere third party, a stranger to the transaction. He is rather a participant. The thing about which the servants are employed is the healing of the sick. This is set in motion, not for the benefit of the defendant, but of the public. Surely, those who accept the benefit, contributing also by their payments to the public enterprise, and not to the private pocket of the defendant, assist as truly as the defendant in setting the whole thing in motion. But the practical ground on which the rule is based is simply this: On the whole, substantial justice is best served by making a master responsible for the injuries caused by his servant acting in his service, when set to work by him to prosecute his private ends, with the expectation of deriving from that work private benefit. This has at times proved a hard rule, but it rests upon a public policy too firmly settled to be questioned. We are now asked to apply this rule, for the first time, to a class of masters distinct from all others, and who do not

and cannot come within the reason of the rule. In other words, we are asked to extend the rule, and to declare a new public policy, and say: On the whole, substantial justice is best served by making the owners of a public charity, involving no private profit, responsible, not only for their own wrongful negligence, but also for the wrongful negligence of the servants they employ only for a public use and a public benefit. We think the law does not justify such an extension of the rule of respondeat superior. It is, perhaps, immaterial whether we say the public policy which supports the doctrine of respondeat superior does not justify such extension of the rule, or say that the public policy which encourages enterprises for charitable purposes requires an exemption from the operation of a rule based on legal fiction, and which, as applied to the owners of such enterprises, is clearly opposed to substantial justice. It is enough that a charitable corporation like the defendant, whatever may be the principle that controls its liability for corporate neglect in the performance of a corporate duty, is not liable, on grounds of public policy, for injuries caused by personal wrongful neglect in the performance of his duty by a servant whom it has selected with due care; but in such case the servant is alone responsible for his own wrong. This result is justified by the opinions in Hall v. Smith [2 Bing. 156], Holliday v. St. Leonard's [11 C. B. N. S. 192], and Union P. R. Co. v. Artist [(C. C. A.) 60 F. 365, 23 L. R. A. 581], supra, substantially on the grounds above stated, and is reached, for one reason or another, by the greater number of courts that have dealt with this particular liability of a corporation for public or charitable purposes."

█ While there are some exceptions, the great weight of authority, notably so in our own state, supports the conclusion reached by Judge Hamersley that a hospital of the character of the one now under consideration is not liable for the negligence of its servants and employees unless it be shown that the hospital was guilty of negligence in the employment or retention of the offending employees or servants. Barnes v. Providence Sanitarium (Tex. Civ. App. San Antonio) 229 S. W. 588; Baylor University v. Boyd (Tex. Civ. App. Dallas) 18 S.W.(2d) 700; Davis v. Gulf, C. & S. F. Ry. Co. (Tex. Civ. App. Fort Worth) 196 S. W. 603; Enell et al. v. Baptist Hospital (Tex. Civ. App. Galveston) 45 S.W.(2d) 395; Galveston, H. & S. A. Ry. Co. v. Hanway (Tex. Civ. App. San Antonio) 57 S. W. 695; Galveston, H. & S. A. Ry. Co. v. Scott (San Antonio) 18 Tex. Civ. App. 321, 44 S. W. 589; Koenig et ux. v. Baylor Hospital, 10 S.W.(2d) 396 (Tex. Civ. App. El Paso); Southern Pac. Co. v. Mauldin (Galveston) 19 Tex. Civ. App. 166, 46 S. W. 650; Texas Central R. Co. v. Zumwalt, 103 Tex. 603, 132 S. W. 113, 30 L. R. A. (N. S.) 1206; Union Pacific

Ry. Co. v. Artist, 60 F. 365, 23 L. R. A. 581 (C. C. A. 8th Cir.); Vermillion v. Woman's College, 104 S. C. 197, 88 S. E. 649; St. Paul's Sanitarium v. Williamson (Tex. Civ. App. Dallas) 164 S. W. 36; Nicholas v. Hospital, 281 Mo. 182, 219 S. W. 643; Roberts v. Kirksville College of Osteopathy & Surgery (Mo. App.) 16 S.W.(2d) 625.

The case of St. Paul's Sanitarium v. Williamson, supra, by the Dallas Court of Civil Appeals, was one, as here, where the patient was burned by a hot water bottle. The Missouri case, 16 S.W.(2d) 625, was one where the patient was burned by carbolic acid.

Appellants cite but two cases in support of their contention that the court erred in giving the peremptory instruction and rendering judgment against them. Armendarez v. Hotel Dieu (Tex. Civ. App.) 145 S. W. 1030, and St. Paul's Sanitarium v. Williamson (Tex. Civ. App.) 164 S. W. 36. These cases we think are distinguishable from the one before us. The case of the San Antonio court in 145 S. W. was one of an injured employee, and the court held that the law governing the relation of master and servant was controlling notwithstanding the charitable features of the hotel, a private corporation. Judge James, who wrote that opinion, cited the following cases as authority for that holding: Hordern v. Salvation Army, 199 N. Y. 233, 92 N. E. 626, 32 L. R. A. (N. S.) 62, 139 Am. St. Rep. 889; Bruce v. Central Meth. Episcopal Church, 147 Mich. 230, 110 N. W. 951, 10 L. R. A. (N. S.) 74, 11 Ann. Cas. 150; Hewett v. Woman's Hospital Aid Ass'n, 73 N. H. 556, 64 A. 190, 7 L. R. A. (N. S.) 496. This distinction or exception is also recognized as existent in the opinion of Judge Rasbury in the case cited from the 164 S. W., Judge Rasbury citing Armendarez v. Hotel Dieu, supra; Basabo v. Salvation Army, 35 R. I. 22, 85 A. 120, 42 L. R. A. (N. S.) 1144; Hordern v. Salvation Army, supra; Hewett v. Woman's Hospital Aid Ass'n, supra; Bruce v. Central Meth. Episcopal Church, supra. The distinction made seems to rest upon reasoning to the effect that a patient of a charitable organization is in a sense or degree a party to and beneficiary of the charity of which it is the purpose of the organization to accomplish, while in cases of injury to an employee of the organization the public policy of enforcing the rules relating to master and servant should prevail over the general rule exempting charitable organizations from the consequences of negligence resulting in injuries to patients. It is said in the authorities that the rule of respondeat superior is based on the ground that the master is presumed to receive a benefit from the labor of his employee, and that he should therefore bear the responsibilities arising out of that relation.

Appellants, however, more insistently press upon us the case of St. Paul's Sanitarium v. Williamson, supra. In that case, as in this,

the wife was severely burned by a bottle of hot water negligently placed and permitted to remain in the bed to which she had been removed after an operation. The court held that the evidence sustained the plea that St. Paul's Sanitarium was a charitable organization, but that the evidence nevertheless supported the verdict and judgment against the Sanitarium for the damages resulting to Mrs. Williamson. The court concluded from the evidence cited in the opinion that upon that occasion one Sister De Sales, "a member of the corporation," selected one Pauline Nash to perform the duty of placing the hot water bottle in the bed; that Pauline Nash was not a nurse but employed in the kitchen to wash dishes and run errands and wholly inexperienced and incompetent to perform the duty of placing hot water bottles in the beds of patients, although she was permitted to do so. The court concluded that the selection of Pauline Nash on the occasion in question to place the hot water bottle in the bed was alone sufficient to sustain the finding of the jury, and further that the evidence sustained the finding of the jury that ordinary care was not exercised in the selection and retention of appellant's servants; it further appearing that after the patient had been placed in bed no examination of the bed for the bottle of hot water to see if it was in a safe position and free from possible contact with the patient had been made, or the bottle removed until after some fifteen or twenty minutes when so directed by Williamson, who observed his wife's body twitching and heard her moaning in pain. These facts the court thought sufficient to sustain the finding that the association had not exercised due care in the retention of their servants.

■ In the case before us, however, the facts are different. In the first place, it does not appear that Sister Mary Albertine, in charge of the floor, was a member of the appellee corporation or a "Sister of Charity of the Incarnate Word, the organization that sponsors St. Joseph's Hospital," and it affirmatively appears that she had no authority to employ or discharge student or other nurses. That power was shown to be in a superior officer, to wit, Sister Arcadis and the Mother Superior. Nor did Sister Mary Albertine appear to have any connection with or control of fees to be paid by patients, the establishment of rules or regulations, or other power tending to show that her status was other than that of a graduate nurse of experience assigned to the mere duty of supervising the student nurses and see that the rules of the association were observed. Nor does the evidence authorize the conclusion that the hospital was guilty of a want of due care in the formulation of its rules. The rules provided that the water put in bottles at the kitchen should be heated to the extent only of 120° F.; that

these bottles were to be filled, placed in, and taken from beds by student and other nurses, the student nurses first having had a preliminary instruction of the proper way to do this.

■■ The burden of proof was upon appellants primarily to establish the negligence on the part of the operating nurses as alleged, and, while it may be said that the evidence is sufficient to require that issue to be submitted to the jury, we do not think it sufficient to warrant the further conclusion, as appellants contend, that such negligence in nature or degree proves or tends to prove negligence on the part of the appellee corporation in the failure to prescribe proper rules of government or in the selection or retention of the offending nurses. So that on the whole we feel unable to say that there is reversible error on the part of the trial court in giving his peremptory instruction and in rendering judgment as he did even though for the purposes of the conclusion it be admitted that either Sister Mary Albertine, Miss Dillingham, Mrs. Buckner, or Miss Stultz, one or all, were guilty of the negligence charged.

Judgment affirmed.