LEVIS SÁEZ, Plaintiff and Appellant, *v.* MUNICIPALITY OF PONCE, REPRESENTED BY MAYOR CARLOS JUAN CINTRÓN, Defendant and Appellee.

No. 12612. Decided February 26, 1962.

516

*Frank Torres* for appellant. *Leopoldo Bonilla Vélez* for appellee.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

This is an action for damages for professional liability.[1] A girl 11 years of age who complained of a sore throat was examined by an intern in Tricoche Hospital, a public-charity institution operated by the Municipality of Ponce. Upon being questioned by the latter, the girl said she had a sore throat and a headache and also a cough. The examination revealed that her tonsils were swollen and audible rales but no wheezing sounds. In the presence of the girl's grandmother who was accompanying her, she was asked if she had ever been given penicillin injections and the reaction thereto, "to which the girl answered that she had had penicillin injections, but had never had any allergic reaction to the drug." No additional test was made in order to determine the degree of the patient's susceptibility to the drug.

With the semeiotic picture described and the aforesaid information, the intern diagnosed the girl's ailment as tonsillitis or bronchitis and prescribed aspirin tablets, an expectorant and intramuscular penicillin, a daily injection of 400,000 units for three days.

---

[1] We have deliberately omitted the use of the term "malpractice" which ordinarily carries with it the connotation of the existence of deliberate negligence or gross ignorance of the physician.

From the medical dispensary—especially equipped for treatment of outpatients not requiring confinement—the minor was referred to the hospital pharmacy where they expended the injections. A nurse gave her an injection on the left arm. The minor was not placed under observation. She left, and hardly ten minutes had elapsed when she fainted at the very gate of the hospital and collapsed, emitting foam by the mouth and presenting signs of cyanosis. She died a few minutes later.

The trial court concluded that "the girl ... was suffering from asthma and died from asphyxia resulting from a bronchial obstruction produced by thick secretions and aria [sic] of atelectasis (incomplete expansion of the lungs). The expert evidence further showed that this serious bronchial obstruction was fatally aggravated by the administration of a 400,000 unit penicillin injection which produced a shock (paralysis) or anaphylactic reaction (hypersensitiveness to the action of certain foods or drugs) which by itself could produce almost instant death in an asthmatic patient." It also concluded that the intern gave the unfortunate girl "the standard medical treatment used for cases of this nature by the other doctors of the community," considered—relying on the decision in Rivera v. Dunscombe, 73 P.R.R. 764 (1952)— that the plaintiff could not prevail because the evidence disclosed the possibility of another cause of the damage, and referred specifically to the testimony of the pathologist, Dr. Edwin Rivera, who performed the autopsy on the body, and who, among other things, testified that "the secretions were very thick and abundant to have been produced on the date of the injection; that those secretions must have been produced before administering the injection, and that he did not find any conclusive evidence that it was the penicillin reaction." This doctor said that the girl could have died on the same tragic day without having been administered peni-

cillin, although he admitted the possibility that penicillin could have produced the death.

The complaint was dismissed.

■ 1. The appellant insists vigorously that the defendant municipality should be liable for the damages caused considering that the doctor who treated and prescribed to the patient had not been licensed to practice his profession in Tricoche Hospital, since the license issued to him merely authorized him to practice as an intern in the District Hospital of Bayamón.[2] The intern's license also read that "Dr. . . . may not practice the medical profession freely in Puerto Rico and he shall do so only within the limits of the aforesaid institution, under the immediate supervision of its medical director." The prevailing doctrine is that the failure to procure a license as required by the local laws regulating the practice of medicine [3] is not of the essence of an action for damages for negligence or unskillfulness of the doctor, in the absence of a showing of causal relation between the damage and the absence of a license. *Brown* v. *Guy*, 301 P.2d 413, 418 (Cal. 1956); *Andrews* v. *Lofton*, 57 S.E.2d 338 (Ga. 1950); *Grier* v. *Phillips*, 55 S.E.2d 485 (S. C. 1949); Annot., *Liability to patient for results of medical or surgical treatment by one not licensed as required by law*, 44 A.L.R. 1418 (1926), supplemented in 57 A.L.R. 978 (1928). It seems advisable to reproduce certain paragraphs of the opin-

---

[2] On the date of the facts alleged in the complaint—June 11, 1956— the said physician was not licensed to practice medicine anywhere in Puerto Rico. Although the license to which we have referred was issued on May 11, 1956, it took effect on July 1 of that year. He had been issued another license to work in Clínica Dr. Pila of Ponce, for the period from July 17, 1954 to July 16, 1955. However, this fact in no way alters the result of the litigation, since the applicable rule of law is the same, whether a person practices without a license or with a license limited to a particular locality.

[3] See §§ 9, 14, and 17 in particular—on special license for interns— of Act No. 22 of April 22, 1931 (Sess. Laws, p. 204; 20 L.P.R.A. §§ 39, 43, and 46).

ion rendered by Mr. Justice Franco Soto in *Maldonado* v. *Hamilton*, 32 P.R.R. 208, 219 (1923), in referring to the lack of a license to drive motor vehicles as index of negligence:[4]

"What facts or circumstances show the causal relation between the defendant's not having a license and the death of Maldonado? The reason given by the appellee is that if the defendant had obtained a license he would have received a copy of Act No. 75 and acted in accordance with its provisions. But such reasoning would have no more value than begging the question and might lead us to the absurdity that the mere fact of having a license should be considered *a contrario sensu* as a conclusive presumption of due diligence whatever the manner in which an accident may occur. Neither view is sound doctrine, for just as the mere possession of a license for driving automobiles does not give immunity to one who causes damage in an accident, so the contrary fact, or the lack of a license, does not of itself imply negligence but rather *prima facie* negligence subject to be controverted by evidence, or to other facts or inferences that may show the causal relation between the lack of a license and the accident."

▆ As stated in *Brown* v. *Shyne*, 151 N.E. 197 (N.Y. 1926), the factor to be determined is whether the obtainment of the license would have prevented the damage. In *Rivera* v. *Dunscombe*, 73 P.R.R. 764, 783 (1952), we outlined the particulars of this action for damages in saying that "[a physician] is liable to his patient for damages only when he is negligent and fails to exercise skill and care. In this aspect a malpractice case is not distinguished from an ordinary case of damages based on negligence."

▆ On the other hand, even if the intern who prescribed the penicillin injection had been negligent, this fact by itself does not establish that the defendant hospital was negligent in employing him. *Sandone* v. *Dallas Osteopathic Hospital*, 331 S.W.2d 476, 480 (Texas 1959); *Parowski* v. *Bridgeport*

---

[4] See, also, *Vélez et al.* v. *Font*, 35 P.R.R. 286 (1926); *People* v. *Pereira*, 49 P.R.R. 869 (1936); *cf. Usera* v. *González*, 74 P.R.R. 454, 457 (1953).

*Hospital,* 134 A.2d 834 (Conn. 1957) ; *Steele* v. *St. Joseph's Hospital,* 60 S.W.2d 1083, 1087 (Texas 1933). See *Vicarious Liability of Hospitals,* 44 Marq. L. Rev. 153 (1961).

▆▆▆ 2. In order that an action to exact professional liability based on the administration of a drug to which the patient is allergic or hypersensitive may prosper, it is necessary to establish that the physician had knowledge of this anaphylactoid reaction, *Yorston* v. *Pennell,* 153 A.2d 255 (Pa. 1959) ; *Horace* v. *Weyrauch,* 324 P.2d 666 (Cal. 1958) ; *Stokes* v. *Dailey,* 85 N.W.2d 745 (N.D. 1957), and 97 N.W.2d 676 (N.D. 1959) ; *Parrish* v. *Clark,* 145 So. 848 (Fla. 1933) ; *Neely* v. *St. Francis Hospital and School of Nursing,* 363 P.2d 438 (Kan. 1961) ; Louisell and Williams, Trial of Medical Malpractice Cases 127, § 4.11 (1960). In *Rotan* v. *Greenbaum,* 273 F.2d 830 (C.A.D.C. 1959), a physician was held liable for administering an injection of 600,000 units of penicillin to a patient who died fifteen minutes later as a result of a paralysis of anaphylactoid origin. Although the facts are similar, the lack of skill consisted in prescribing an inadequate therapeutic for mumps, which was the patient's affliction. In the instant case it has not even been intimated that the administration of penicillin was not the standard treatment for the symptoms which the minor presented upon examination. Regarding the knowledge of the anaphylactic condition, the trial court concluded that the standard practice in the community which is limited to asking the patient whether the drug in question has produced any reaction on previous occasions, had been observed.[5] It thus resolved the conflict

---

[5] As a general rule, the physician's liability is to be determined by the standard of care ordinarily adhered to in similar cases by other physicians of the locality, *Rivera* v. *Dunscombe, supra* at 782; 6 U. of Pitt. L. Rev. 113 (1940); Nathan, Medical Negligence 19–36 (1957). This standard of care and competence is a question of fact ordinarily requiring expert evidence, *Di Filippo* v. *Preston,* 173 A.2d 333 (Del. 1961) ; *Cooper* v. *Providence Hospital,* 130 So.2d 8 (Ala. 1961) ; *Marsh* v. *Pemberton,* 347 P.2d 1108 (Utah 1959) ; *cf. Richison* v. *Nunn,* 340 P.2d 793 (Wash. 1959) ; commentary, 30 Temple L. Q. 448 (1957). The expert for the plaintiff ad-

in the evidence. An examination of the transcript supports this conclusion.

3. In *Rivera* v. *Dunscombe, supra,* we said at p. 783 that "The mere possibility that a doctor's negligence has been the proximate cause of injury is not sufficient to establish a malpractice case for negligence against a defendant; should there exist the possibility that other causes might have interfered, it is plaintiff's duty to exclude them, showing that the doctor's negligence was actually the proximate cause of the injury." As stated above, an action to exact professional liability is not different from an ordinary case of damages for negligence. It is only necessary that the plaintiff establish by a preponderance of the evidence, believed by the trier, that the resulting damage was caused by acts of negligence, lack of care or skill of the physician. There is a presumption, *in the absence of evidence to the contrary,* that a degree of reasonable care has been exercised and that the adequate treatment was administered to the patient. The plaintiff is bound to present sufficient evidence to controvert this presumption, and to that end the evidence should show that

mitted that the practice adhered to by the intern was the standard practice in Ponce.

As respects hospitals, we have held that the care and attention due a patient must be reasonable, and that these are measured by "standards of reasonability and prudence." And we added that "the practice prevailing in the community can serve as a guide." *Hernández* v. *The Capital,* 81 P.R.R. 998, 1005 (1960).

Although it is not expressly involved in this case, we believe it is advisable to point out that this standard on the observance of the practice or treatment in the locality has evolved with the progress in the means of communication and greater facilities which enable the physician to keep abreast of the latest scientific advancements. Nor is the concept of community confined to a particular town, but the factor of accessibility to a better treatment comes into play. See *Gist* v. *French,* 288 P.2d 1003 (Cal. 1955); *Tvedt* v. *Haugen,* 294 N.W. 183, 188 (1940). Considerations of specialization may also require a special degree of skill in the same situation. *Carbone* v. *Warburton,* 91 A.2d 518 (N.J. 1952). For an elaborate discussion of the medical liability, see McCoid, *The Care Required of Medical Practitioners,* 12 Vand. L. Rev. 549–632 (1959).

there is more than a mere *possibility* that the damage was due to the physician's failure to do his duty. It is necessary that the relation of causation should not be the product of mere speculation or conjecture, *Johnson* v. *Ely*, 205 S.W.2d 759 (Tenn. 1947); *Lanier* v. *Trammell*, 180 S.W.2d 818, 824 (Ark. 1944), but a preponderance of the evidence, *Demchuk* v. *Bralow*, 170 A.2d 868 (Pa. 1961); *Atkins* v. *Humes*, 107 So.2d 253 (Fla. 1958); *Soest* v. *Balsinger*, 141 P.2d 13 (Cal. 1943); *Sansom* v. *Ross-Loos Medical Group*, 134 P.2d 927 (Cal. 1943); *Lohr* v. *Watson*, 2 N.W.2d 6, 8 (S.D. 1942), namely, that it was more probable that the harm resulted from the negligence imputed by the plaintiff. *Crewse* v. *Munroe*, 355 P.2d 637 (Ore. 1960); *Thompson* v. *Lillehei*, 164 F.Supp. 716 (Minn. 1958); *cf. Steele* v. *Woods*, 327 S.W.2d 187 (Mo. 1959). He can not be required in this respect to exclude every other possible causation of the damage.[6] *Christie* v. *Callahan*, 124 F.2d 825, 840 (C.C.A. D.C. 1941); *Barham* v. *Widing*, 291 Pac. 173, 177 (Cal. 1930); *Boles* v. *Hotel Maytag Co.*, 253 N.W. 515, 517 (Iowa 1934). If the evidence discloses more than one possible cause of the damage, the physician can not be adjudged liable unless the evidence

---

[6] Should we require that every other *possibility* as causing the damage be excluded, the success of a plaintiff would be very difficult, considering that medicine is not an accurate science and that absolute accuracy is rarely possible. On the other hand, we can not ignore the spirit of tribal solidarity prevailing among members of the medical class which is openly reluctant to testify as experts for the claimants. See O'Hara, *The Reasons for the Reluctance of Physicians to Testify*, 2 Vill. L. Rev. 101–05 (1956); *Coercion by a Medical Association to Preclude Availability of Expert Testimony in a Medical Malpractice Action*, 58 Mich. L. Rev. 802 (1960). To some extent, this attitude is due to the practice of many members of the legal profession, who are ever willing to bring an action against a physician, without due consideration to the probabilities of success, thereby discrediting the defendant's good reputation, even if temporarily. Wade, *Public Responsibilities of the Learned Professions*, 21 La. L. Rev. 130 (1960). Furthermore, the practice of insurance companies which cancel the policies of physicians who testify in favor of the plaintiffs is well known. These organizations are not truly the best guardians of the morals and conscience of a physician.

as a whole shows that the negligent act for which he is responsible is the more probable.[7]  *Ritter* v. *Sivils*, 293 P.2d 211 (Ore. 1956) ; *Heinlich* v. *Harvey*, 39 N.W.2d 394 (Wis. 1949) ; *Woronka* v. *Sewall*, 69 N.E.2d 581 (Mass. 1946) ; *Anderson* v. *Nixon*, 139 P.2d 216, 220 (Utah 1943). See Annot., *Proximate cause in malpractice cases*, 13 A.L.R.2d 11 (1950).

■ But even though we applied to the present case the rule discussed in the preceding paragraph, we would still have to consider that, according to the findings of fact of the trial court, the fact alone of prescribing the penicillin injection would not constitute negligence in the absence of proof that the physician had knowledge of the minor's hypersensitive condition.[8]  On the other hand, we have already established that the standard treatment in the community was administered.

■ Lastly, the appellant insists that there was negligence in permitting the minor to leave the hospital immediately after giving her the injection and in not placing her under observation.  It was not clearly established which

---

[7] Regarding the existence of a presumption of negligence in medical and hospital cases, see Louisell and Williams, Trial of Medical Malpractice Cases 418–60, § § 14.01–14.09 (1960) ; Annots. in 68 A.L.R.2d 426 (1959) ; 58 A.L.R.2d 216 (1958) ; 54 A.L.R.2d 208 (1957) ; 53 A.L.R.2d 142 (1957) ; 51 A.L.R.2d 970, 973 (1957) ; 41 A.L.R.2d 329, 355 (1955) ; 29 A.L.R.2d 504 (1953) ; 162 A.L.R. 1265 (1946) ; 152 A.L.R. 638 (1944) ; 141 A.L.R. 111, 158 (1942) ; 65 A.L.R. 1023, 1031 (1930). See, also, Louisell and Williams, *Res Ipsa Loquitur—Its Future in Medical Malpractice Cases*, 48 Cal. L. Rev. 252 (1960) ; Mackey, *Res Ipsa Loquitur in Malpractice Cases, the Superior Knowledge Factor*, 9 Hast. L. Rev. 322 (1958).

[8] Regarding the anaphylactic reactions by administration of penicillin, see Hussar and Holley, Antibiotics and Antibiotic Therapy 62–68 (MacMillan Company, 1954) ; Mayer *et als.*, *Penicillin Anaphylaxis*, 151 J.A.M.A. 351 (1953) ; Feinberg *et als.*, *Penicillin Anaphylaxis, Non Fatal and Fatal Reactions*, 152 J.A.M.A. 114 (1953) ; Fraser, *Immediate Anaphylactic Shock from Oral Penicillin*, 2 M. J. Austr. 801 (1958) ; Miller *Anaphylactoid Reaction to Oral Penicillin*, 11 U.S.A.F. Med. J. 451 (1960) ; Martínez Cortés, *La Alergia a la Penicilina*, 90 *Gaceta Médica de Méjico* 991 (1960).

was the standard practice in the community, and the transcript merely discloses a reference to the fact that it is a good practice to observe the patient, but it is not necessary to do so (Tr. Ev. 116), and that as a general rule when many patients are receiving treatment, they are discharged as soon as the injection is given (*Id.* 11, 117). Nor was any evidence introduced on the possibilities of surviving an anaphylactic shock. From scientific studies which driven by curiosity we have made—see the works and articles cited in footnote 8— we infer that, although it is possible, it is highly improbable, particularly in the case of intramuscular administration.[9]

We need not discuss the other questions raised by the appellant in view of the fact that the negligence of the defendant's employee was not established.

The judgment rendered by the Superior Court, Ponce Part, on November 7, 1957, will be affirmed.

Mr. Justice Santana Becerra concurs in the result.

---

[9] In cases of anaphylactic shocks produced by oral penicillin, the use of adrenalin (epinephrine) and antihistamines has helped to save the patient. The use of intravenous aminophylline is also recommended.