[Civ. No. 7560. First Appellate District, Division Two.—May 21, 1931.]

SARAH PEACOCK et al., Respondents, v. BARNEY LEVY et al., Appellants.

Barry J. Colding, Theodore Hale, Carroll B. Crawford, John J. Jones and Owen D. Richardson for Appellants.

Alfred Aram and H. A. Blanchard for Respondents.

SPENCE, J.—Plaintiffs herein are husband and wife. They brought this action against several defendants to re-

cover damages alleged to have resulted from injuries sustained by the wife. The trial court granted motions for nonsuit made by defendants L. B. Archer and Joseph Alva. The jury rendered a verdict for $10,000 in favor of plaintiffs and against the remaining defendants, from which judgment said defendants appeal.

Before discussing the merits of this appeal respondents' motion to dismiss the appeal should be considered. This motion was made upon two grounds. The first ground is that appellants' opening brief did not comply with the requirements of section 953c of the Code of Civil Procedure. An examination of the brief convinces us that there has been a substantial compliance with the provisions of that section. ■ The second ground is that appellants failed to comply with rule I, section 4, of the Rules of the Supreme Court and District Courts of Appeal in that appellants failed to serve a copy of the opening brief upon the attorney for each "respondent" who appeared separately in the lower court. Service was made upon the attorneys for respondents Sarah Peacock and Samuel Peacock, but no service was made upon the attorneys for the defendants L. B. Archer and Joseph Alva. It is a sufficient answer to point out that this appeal is taken from the judgment in favor of respondents Sarah Peacock and Samuel Peacock and against appellants. No appeal was taken from the judgment of nonsuit in favor of the defendants Archer and Alva. These last-named defendants are not "respondents" on this appeal and the above-mentioned rule does not require service of the brief upon the attorneys for said defendants. Respondents' motion to dismiss the appeal should therefore be denied.

Proceeding to the merits of the appeal, we find that appellants argue for a reversal upon several grounds, among which are excessive damages, insufficiency of the evidence to show that the injured woman's alleged ailments were proximately caused by the accident and prejudicial misconduct on the part of counsel for respondents which prevented appellants from having a fair trial. In our opinion the judgment must be reversed because of the prejudicial misconduct hereinafter referred to and we therefore deem it unnecessary to discuss at length the other contentions made by appellant.

On June 3, 1929, Sarah Peacock, hereinafter referred to as respondent, fell over an obstruction on the sidewalk in front of appellants' store, sustaining what appeared to be minor injuries. She testified that she was dazed and had a headache as the result of the fall; that her back, her side and her ankle were paining her. She was assisted to her home. She did not seek the advice of a doctor until three days later, at which time she visited the office of Dr. Cottrell. On June 11th, five days after the first visit, the doctor called at her home and found her in bed. He strapped her back and gave her some medicine. About June 21st she developed vomiting spells which the doctor was unable to control before leaving to attend a military training camp on June 29th. Respondent further testified that she was pregnant at the time of the accident and that between the twelfth and eighteenth days after the accident she had a miscarriage for which Dr. Cottrell treated her. The doctor, called as a witness by respondent, testified that he "didn't treat her for a miscarriage, did not have any idea of a miscarriage", but that fluid extract of ergot was prescribed to correct flowing following a delayed menstrual period. Respondent testified that after the soreness due to her fall had worn off she suffered from chronic vomiting spells and inability to void urine requiring catheterization. She treated with several doctors and spent a portion of the time in hospitals between the date of injury and the time of trial, claiming that she was suffering from nervous disorders. On the trial the physician who was then attending her testified that she had told him that she had previously had four or five miscarriages and further stated: "She told me she had them performed on her as a result of surgical interference." Respondent was thirty-eight years of age and when the doctor was asked whether these abortions would impair the health of a woman of respondent's age and temperament, he stated: "Oh, it may and may not. Usually we rather advise against it because of the possibility that it will." There was a sharp conflict in the medical testimony relating to respondent's condition. Some of the doctors were definitely of the opinion that respondent had been malingering and feigning her symptoms. It was respondent's contention that all of her alleged ailments were due to the fall, while appellants claimed that

her injuries due to the fall were of a minor nature and that her ailments, if any, from which she may have suffered thereafter were the result of repeated abortions and not attributable to the accident.

█ Keeping in mind the situation as above outlined and the fact that a large verdict was awarded for the alleged results of the fall, we may now consider the alleged misconduct. This consisted of repeated references to insurance by counsel for respondent and the repeated denunciation of one of appellants' counsel as an atheist. Although no insurance company was a party to the action, counsel for respondent lost no opportunity to get a reference to insurance before the jury. On redirect examination of Dr. Fernish, respondent's witness, counsel for respondent asked: "Q. Dr. Fernish, they have brought up the question of Dr. Ryan, how did Dr. Ryan happen to go, to request that he examine Mrs. Peacock, who was he representing? A. I don't know who he was representing except the insurance company." Again, when Dr. Kneeshaw, a witness for appellants, was being cross-examined, he was asked: "Q. Oh, at whose request did you examine her? A. At Mr. Doolin's request. Q. Who is Mr. Doolin? A. Mr. Doolin is some adjuster, I think." Thereafter on the same cross-examination counsel for respondent put several questions to the doctor regarding his work in testifying for the defense in personal injury cases and finally elicited the following statement from the witness: "And the attorneys will tell you that, I would say about thirty per cent of the cases, not over thirty, about ten per cent of the cases that I examine for insurance companies ever reach court."

Following the testimony counsel for respondent made numerous reference to insurance in his argument. He said: "But, wait, if Mr. Richardson's logic is correct, which I reiterate it, it is not correct, but if his logic here, he urged that logic on you, carry it one step further, am I entitled to follow that logic and say that then if that is true then Dr. Ryan and Dr. Kneeshaw who were sent to examine this woman by the insurance company and were paid by them, they also did violence to their integrity, no, but I am showing you how far that kind of logic goes, I am satisfied that neither Dr. Ryan nor Kneeshaw did any such thing." Again he said: "There has been another very great effort

to raise grave prejudice in your minds against Mrs. Peacock. Before I call your attention to it I want to say this: I have been practicing law here not very long, but have some experiences. I have been in cases where insurance companies were involved, and they are anxious to pay as little as possible naturally. I want to say especially to the ladies of this jury that there is a well-defined, well-organized conspiracy to make a courtroom scene so disagreeable, especially for ladies, especially where there is an insurance company involved, that they will be forced to settle for what it is offered rather than go to court, to make it disagreeable. They have referred to something like saying that Mrs. Peacock's present condition is due to her own violation of the laws of nature. You know what I refer to.'' Returning to this subject he later said: ''I assume that Mr. Richardson's attitude is that simply that because someone has been paid by a patient, by that fact alone, he is not to be trusted as to his testimony or as to his conclusions. As I said, I don't believe that. That is silly, and I would not do the discourtesy to these good professional men like Dr. Ryan and Kneeshaw and say if that is a fact they also damned their souls in the court because paid by an insurance company, I wouldn't do such a thing, it is silly. I know they are honest men. They can have difference of opinion without running the risk of being branded as falsifiers. How often in your own experience, ladies and gentlemen of the jury, where you have known where a doctor for a long time did not know what was ailing the patient, but kept examining, treating, giving tests, and so on, trying to find just what was ailing the patient. It is not necessary and it is not true that simply because Dr. Ryan and Dr. Kneeshaw were paid by the defendants in this case or the insurance company and went out there—

''By Mr. Jones. Just one moment, if your Honor please, I am going to assign the repeated reference of counsel to insurance company as misconduct. Dr. Ryan testified he was hired by the firm of Colding & Hale, and it was out of the mouth of Dr. Fernish, who stated he was there by Insurance Company's request.

''By Mr. Aram. Dr. Kneeshaw testified he was paid by the Insurance Company.

"By Mr. Jones. Dr. Kneeshaw said he repeatedly testified in insurance cases. Counsel keeps repeatedly referring to an insurance company, it is understood of course we know the import of that. I assign it as misconduct, ask the Court to instruct the jury to pay no heed thereto.

"By Mr. Aram. We are willing to take the consequences in this case. I say to the jury I am not making any statement in this case with any idea of not going through with the statement, but merely raising an impression. I want to tell you it is your sworn duty, so far as I am concerned, to do what you honestly believe is just and right, and does not make any difference whether insurance company or John D. Rockefeller himself, I expect of course you are conscientious. That is silly. . . . "

The assignment of misconduct and request that the jury be admonished was not acted upon by the court and counsel continued his argument. The denunciation of Mr. Richardson, one of appellant's counsel, was as follows: "It is possible and it always happens to have an honest different point of view, but I understand Mr. Richardson's attitude, and I will pay my compliments to him this way. In all my experience in life I am yet to find one single person who openly and avowedly does not believe in God and that man didn't have a frozen, poisoned, shriveled lump where his heart ought to be. To feel that there can be honest difference of opinion without violence to integrity requires that tolerant and understanding attitude which bespeaks of the brotherhood of man, but there can be no brotherhood of man unless one first recognizes the common fatherhood of God. It is said in the Book which Mr. Richardson publicly and avowedly says he does not believe in and it is for simpletons to read, 'Keep thy heart with diligence for out of it are the issues of life.' That explains Mr. Richardson and his attitude." Later counsel again stated: "Mr. Richardson is not sincere in that statement, but as I said I am tolerant, I do not expect to find as I said inside of a man who avowedly denies God anything but a frozen poisoned, shriveled up lump where his heart ought to be."

It requires no citation of authority to demonstrate the impropriety of counsel's argument. We need not pass upon the question of whether the questions propounded and answers given were proper to show the possible interests of

certain witnesses for it is apparent from the argument that respondent's counsel was not challenging the integrity, motives or interest of those witnesses. He was obviously using the testimony referred to for an entirely different purpose, to wit, to impress upon the jury the fact that certain defendants carried insurance; and not content with repeatedly conveying such information to the jury in his argument he went further and charged in substance that the insurance companies had entered into a ''well-defined and well-organized conspiracy'' to harass injured persons, especially ladies, and to force such persons to settle their claims for inadequate amounts. To further incite the prejudice of the jury, counsel for respondent on more than one occasion made an unwarranted attack on counsel for appellant. The remarks relating to counsel's religious beliefs or nonbeliefs could not possibly serve any legitimate purpose and could only be calculated to engender prejudice and hatred toward appellants' counsel and the cause he was representing. Counsel for respondent argue that the statements regarding appellants' counsel were true and that it was the duty of appellants' counsel to deny them if he could truthfully do so. We are not concerned with the truth or falsity of those statements. Whether true or false, they were highly improper and no duty rested upon counsel to deny them and thereby raise an issue upon an entirely irrelevant matter. Counsel further argue that these remarks were justified by the argument of appellants' counsel. We can conceive of no argument on the part of appellants' counsel which would serve to justify the remarks complained of, but we have examined the record and our search has been in vain.

Summing up the situation, we find that the misconduct in the present case consisted of numerous improper remarks in the argument whereby the flames of prejudice were fanned to such a point that no admonition on the part of the court could extinguish the fire. ▮ Under the circumstances we believe that it is immaterial that counsel for appellants did not object at every turn, more particularly for the reason that their objections and requests were not acted upon when made. It has been held that the admission of testimony relating to an insurance company may constitute prejudicial error (*Citti* v. *Bava,* 204 Cal. 136

[266 Pac. 954]), and that a reversal may be required even though the trial court upon motion strikes out such testimony and instructs the jury to disregard it. (*Squires* v. *Riffee,* 211 Cal. 370 [295 Pac. 517].) We believe that even where some mention of insurance creeps into the testimony without objection, a far more prejudicial effect can be accomplished by the improper use of such evidence in the argument. In our opinion the repeated references to insurance for the purpose above mentioned, coupled with the charge of conspiracy on the part of insurance companies and the unwarranted attack upon appellants' counsel, constituted flagrant misconduct of such a prejudicial nature that section 4½ of article VI of the Constitution cannot be relied upon to save the judgment. As was said in *Keena* v. *United Railroads,* 197 Cal. 148, at page 160 [239 Pac. 1061, 1065]: "Such means of winning a lawsuit cannot be commended or receive recognition and indorsement by this court, instituted and maintained, as it is, on the principle of administering justice."

For the foregoing reasons respondent's motion to dismiss the appeal is denied and the judgment is reversed.

Nourse, P. J., and Sturtevant, J., concurred.