[Civ. No. 20424. Second Dist., Div. Two. Oct. 17, 1955.]

WINNIE GIST et al., Respondents, v. EDISON A.
FRENCH, Appellant.

248

Griffith & Thornburgh, Lamb, Hoge & Killion and Lamb & Hoge for Appellant.

Charles K. Buck and Emmett R. Burns for Respondents.

MOORE, P. J.—Dr. Edison A. French appeals from a judgment of malpractice whereby he was adjudged to pay $70,000 for his negligence in the treatment of Winnie Gist and $9,000 to her husband for loss of services and consortium. He demands a reversal on the grounds of (1) asserted prejudice in the erroneous admission of certain evidence, (2) unwarranted comments upon certain evidence, (3) accusing appellant of belonging to a combine which suppressed evidence, (4) giving and refusing certain instructions.

Appellant operates a hospital and clinic at the city of San Luis Obispo, a city by the sea halfway between Los Angeles and San Francisco. Mrs. Gist, 37 years of age, visited his clinic on February 25, 1952,[1] complaining of a pain in her right side. After a complete physical examination, he advised that the tumor be removed. He said nothing about the removal of any organ of the body or of anything else that would have to be done. He sent her home to consult her husband. The latter having agreed that a necessary operation should be done at once, she returned to the hospital on the

---

[1]She had been examined by him in 1949 when he advised her of the presence of a small tumor in her uterus.

same day. Without her consent to any operation other than the removal of the tumor, without any preoperative tests or a biopsy, she was put to sleep. A spinal anesthetic was administered, and without the aid of an assistant surgeon, appellant applied his surgical instruments and removed her uterus, cervix and appendix.

During the succeeding 10 days, her deterioration was rapid. She had no appetite, suffered nausea, dizziness and an intense roaring in the head and throbbing of the body, and was weak and apathetic, drawn and pale. It was developed that in the performance of the delicate operation, he had severed the vaginal branch of the uterine artery and failed to tie it off. It is a pulsing blood vessel about half the size of the lead of an ordinary pencil. She bled continuously during her 10 days in the hospital. She sweated generously every night. Whenever she awoke, her gown was "wringing wet and cold," befouling her bed. She could eat no food, and had an abnormal thirst. In the absence of Dr. French who was at a meeting in Los Angeles, his employee, Dr. Sullivan, insisted upon Mrs. Gist's being up and moving about. On the very next day after the operation, she was taken from bed to walk and on the 27th she was "made to walk," but she fainted and was "bodily taken back and put to bed." She was visited by a registered nurse only once daily and, during the 10 days of her confinement, appellant made no examination of her and saw her only on the morning of the 26th of February, the day after the operation, and again on March 5th when he discharged her. The hospital records show that during the 10 days, she was in a precarious condition: suffered backache, nausea, insomnia,, dizziness, fever, abnormal pulse, crackling in her ears, a drop in the red blood count from 4,050,000 to 3,170,000; in her white blood count from 13,100 to 12,500, and in the hemoglobin from 11.7 to 9.1.

During appellant's absence from the hospital, he had two physicians care for his patients. Dr. Wolfe's duties included that of administering medical treatments to adults. When he discovered Mrs. Gist's hemoglobin count was 9.1, he determined that it indicated microcytic anemia, a serious loss of blood and oxygen in the blood. He was of the opinion that, according to the standard of care of local doctors, an inquiry should have been made to determine whether there had been a loss of blood. But he made no examination of the lady; did not ascertain her blood pressure or examine her record, insisting that he merely observed for the benefit of appellant.

Dr. Sullivan also was there as appellant's employee. He first saw Mrs. Gist on March 2. He then observed the hemoglobin count of February 26 to have been 11.7. On March 4 he caused a complete blood count to be made which revealed the hemoglobin drop to 9.1; but in some way that change got entered on the hospital chart as of March 2. He, therefore, knew not only that 9.1 was a low hemoglobin count and that it was significant, but he knew also the vaginal bleeding, dizziness and crackling of the ears were significant. However, Dr. Sullivan denied responsibility for the reduced status of Mrs. Gist's health for the reason that she was appellant's patient and that she continued to be his responsibility until discharged.

Appellant admitted that he had made no preoperative tests; that at the time of her discharge on March 5 he knew her record and the changes in her blood count; that before sending her home, he did not take her blood pressure. He testified that the standard of the ethics of surgery in San Luis Obispo was no lower than that of larger communities; that his hospital was a member of three associations of hospitals, to wit, American, Western, California.

### The Second Operation

On Thursday, March 6, Mrs. Gist had a gushing of blood from her vagina. This was repeated on Friday, and on Friday night she felt five large hard clots expelled. Despite her panic, her husband did not telephone appellant until Saturday morning. Frightened, weak and bleeding, about 10 a. m. she was rushed to the hospital and immediately to surgery. While on the operating table, then for the first time she was typed for blood, but the operation was not begun until 12:35 p. m. A 5-inch incision was made into the pelvic cavity. More than two cups of blood were sponged out and large clots were removed. Appellant then removed the left tube and ovary; also part of the broad ligament and any area that had become saturated with the blood from the injured uterine artery. The broad ligament had to be dissected in order to have access to the artery.

Not only did appellant fail to call anyone who had witnessed the first operation to testify, but he produced none who was present at the second. However, respondents called Dr. Sullivan who assisted appellant. He testified that he held the clamp to assist appellant to tie the artery; that after it was tied, it did not bleed any more. From the fact that the artery

did not bleed again after appellant tied it, and from the voluminous testimony of Dr. Sullivan, the jury had good cause to believe that at the first operation, appellant did not tie the vaginal branch of the uterine artery and that such negligence was the cause of all the ills resulting to Mrs. Gist from the first operation. During deliberations, the jury returned to court and requested the reading of Sullivan's testimony. After hearing it, they reported their verdicts.

When the pelvic cavity was opened and the blood and clots sponged out, blood was still oozing out of the left side from beneath the left ovary and tube. The blood was in the tissues. "It had eroded its way right through it and the bleeding appeared to be coming from just under there." When appellant placed clamps on the broad ligament, saturated with blood, to expose the bleeding place, the vaginal branch of the left uterine artery was seen cleanly severed across without split or cut in the sides. The swollen and blood-eroded organs had held the bleeding in check. The ovary and tube were "saturated with blood." When the broad ligament was clamped back "the artery was free to bleed and bled freely." It had supplied the cervix and the uterus which were cut out at the first operation. But "the blood had just by pressure eroded thru the entire area." The pressure was caused by the blood's filling the area, swelling all the tissues. "When we tied this artery it's never bled from that day to this." All other arteries that had been cut at the first operation had been previously tied off and were not bleeding when the pelvic cavity was opened for the second time. But the cut end of the vaginal branch of the left uterine artery could be seen and it was the only one bleeding. After the second operation, Mrs. Gist suffered no complications; all traces of vaginal bleeding disappeared within five days. She went home on March 20, but returned to appellant for examination and treatment of her draining incision every two days until May 17, 1952. She suffered a complete breakdown and entered another hospital.

Appellant maintained that he was not negligent at the first operation; that he had properly tied the uterine artery; that by virtue of the presence of a mysterious chemical agency in the body of Mrs. Gist, the catgut on the artery was dissolved; that such dissolution was followed by a hemorrhage through no fault of the surgery. His theory as to the presence of a mysterious property was rejected by the jury in favor of the theory of respondents, to wit: when an artery is tied,

a clot forms inside the vessel next to the tie. Appellant contended that the clot as well as the suture was dissolved[2] and that the chemical agency originated in the vagina and was not in the blood itself. That the strange force played havoc with the end of the uterine artery and not with the ends of other arteries that had been tied with the same material, appellant could explain with no language other than that it was one of those mysterious things that defy explanation. Such reasoning evidently was not calculated to convince the jury in view of the facts already recited as well as the fact that appellant used the same chromic tie on the same artery in the second operation, and at exactly the same point at which he claimed to have used it in the first operation. Also, he offered no rebuttal of respondents' testimony. He called no witness to refute the testimony that the 0.4 fibrin growth on the specimens removed at the second operation showed that the hemorrhage from the artery occurred over a period of many days. Neither did he offer to refute the proof that the vaginal branch of the left uterine artery in the uterine speciman bore no clamp mark. Such mark would have been potent proof that the artery had been tied off. Other facts established will be adverted to in the following discussion of the issues presented on appeal.

## I.

It is contended that Fred Gist is not entitled to recover for damages suffered by reason of the loss of cohabitation and of his wife's services. The trial court instructed the jury that if their verdict should be for Mrs. Gist, they should award her husband "such damages as . . . will reasonably and fully compensate him for deprivation of cohabitation and the monetary value of loss of the services and society of his wife, not exceeding $50,000." He was awarded $9,000. Appellant contends that in the absence of proof of loss of Winnie's services, such verdict was necessarily for loss or impairment of the conjugal relationship resulting from the shortening of the vagina. He supports such contention with the inadvertent dictum included in the decision of *Meek* v. *Pacific Elec. Ry. Co.*, 175 Cal. 53 [164 P. 1117]. It is not authority. The subject was not presented by that action. In view of the failure

---

[2] "In order for tissue to heal, there has to be what we call an inflammatory reaction take place, where there is an increase in the blood supply to that area, where the tissue actually becomes swollen, where there is increased temperature in that area, and actually there is also a little pain."—Dr. French.

of the Legislature to forbid recovery for such loss, it would be unreasonable to conclude that the loss of enjoyment of the sex relation by either party to a marriage is not recoverable from him who caused such loss. The marriage relationship is a matter of vital concern to the state. Its maintenance is encouraged and sanctioned by every honorable institution and every worthy person. There is no amount of sentiment or of gold that is so effective in preserving the comfort, the tranquility and the happiness of a man and a woman united in wedlock for lifetime as does their conjugal relationship. Merely because no judgment for damages for such deprivation through the wrongful act of another has been reported is not a condemnation of that type of action. It is a privilege man acquires by contract with his spouse and the deprivation of it through the negligence of another is the loss of an invaluable right. "What greater loss could a husband suffer, for example, than the destruction of normal, sexual relations in his married life and the hope of children of his own blood?" (Armstrong's California Family Law, vol. 2, p. 1504.) In 21 American Law Reports, 1519, the annotation says that the great weight of authority sustains the husband's right to recover for loss or impairment of his right to conjugal society and assistance. [3] A husband is entitled to reasonable compensation for the loss of "the services, consortium, companionship, and society of his wife." (*Bedell* v. *Mandell,* 108 N.J.L. 22 [155 A. 383].) Like actions for pain and suffering, no definite rule can be prescribed for the measurement of the loss of his wife's society. [4] The value of such loss must be determined by the triers of fact in the exercise of a sound discretion in the light of their own experience, observation and reflection. (*Robison* v. *Lockridge,* 230 App.Div. 389 [244 N.Y.S. 663]. See also *Hagy* v. *Allied Chemical & Dye Corp.,* 122 Cal.App.2d 361, 374 [265 P.2d 86] ; *Edminster* v. *Thorpe,* 101 Cal.App.2d 756, 759 [226 P.2d 373].) Testimony as to the value of such loss is not necessary. (*Ibid.*)

In the case at bar, the proof was that prior to the misfortune that befell Winnie Gist by reason of the negligent surgery, she was a fairly healthy, cheerful, normal woman, active domestically and socially. She had cared for and served her husband and children to their health and happiness. After appellant had finished his work on her, she was discouraged and despondent; she could not do her work inside or outside the home. Winnie was nervous and continually upset; stormed at her children and created an atmosphere of unhap-

piness; she was suffering a surgical menopause. Her blood in great quantities had been so spilled as to leave her dejected and forlorn; her ovary had been clipt unnecessarily from her body; her vaginal vault shortened to one and three-fourths inches.

In *Hale* v. *San Bernardino Valley Traction Co.*, 156 Cal. 713 [106 P. 83], not only did the allegation of the deprivation of services constitute a valid cause of action, but it was held also that damages accruing from the loss of "society, comfort, care, and protection" of a spouse are proper subject of legal action against him who unlawfully caused the loss. The parties to a marriage are each entitled to the comfort, companionship and affection of the other. Any interference with the right of either spouse to the enjoyment of the other is a violation of a natural right as well as a legal right arising from the marriage relation. (*Hitaffer* v. *Argonne Co., Inc.*, 183 F.2d 811 [87 App.D.C. 57, 23 A.L.R.2d 1366].)

That Fred Gist suffered some detriment by virtue of the loss of Winnie's services should require no further listing than the common duties imposed upon a wife and mother. The court instructed the jury that they were the sole and exclusive judges of the facts; that they were not to consider as evidence any statement of counsel except their stipulations and no statement of the court as law except as set forth in its instructions. ▪ Hence, in estimating the damage to Fred Gist, the jury were correctly directed to consider nothing but the evidence and their own experience. (*Rednall* v. *Thompson*, 108 Cal.App.2d 662, 665 [239 P.2d 693].) She had rendered valuable services in keeping the home. Besides loving and caring for her children and serving her husband, she kept house, sewed and ironed for the girls, mowed the lawn, planted flowers, trimmed the trees, and maintained a garden. When it was required, she painted the interior of her home. Also, she entertained for her family. She was then a calm and capable woman.[3]

## II.

▪ Appellant was not prejudiced by the court's statement that local doctors are reluctant to testify in a malpractice case. No such statement was contained in an instruction. The court's statement occurred during the trial in response

---

[3]Appellant makes no contention that Mrs. Gist is not a sick and nervous woman.

to appellant's objection to a question as to whether standards are different in any of the communities in which Dr. Kirkle had practiced. The court's response was: "the courts have recognized that where it's confined to the community the difficulty of getting other doctors to testify in a proceeding of this type [is well known]. They are reluctant to do it." That the court's language could not have prejudiced appellant was demonstrated then by statement of respondents' counsel that he could not get the physician then treating Mrs. Gist to testify.

The court's remark carried no evil implications. It was merely an open recognition of the truth of the popular legend that doctors are reluctant to testify to the negligence or incompetency of their fellows of the same vicinity. (See *Huffman* v. *Lindquist*, 37 Cal.2d 465, 483 [234 P.2d 34, 29 A.L.R.2d 485].) It was made in response to the contention being made by appellant to the testimony of Dr. Kirkle who resides in Sacramento. If it had been calculated to poison the minds of the jurors, as appellant now contends, his counsel would have moved either for a mistrial, or to strike it, assign it as misconduct and admonish the jury to disregard it. Having failed to apply such remedies, appellant must be deemed to have waived objection to the court's remark. (*Crooks* v. *Glens Falls Indem. Co.*, 124 Cal.App.2d 113, 118 [268 P.2d 203]; *Rednall* v. *Thompson, supra*; *Bates* v. *Newman*, 121 Cal.App.2d 800, 811 [264 P.2d 197].)

Conceding, arguendo, the vice of the court's language, as contended by appellant, it is deemed to have been swept away by the instruction that if "I have said or done anything which has suggested to you that I am inclined to favor the claims or position of either party, you will not suffer yourselves to be influenced by any such suggestion."

The last quoted instruction is evidence of the court's zeal to conduct a fair and orderly trial. The criticized remark was harmless in view of section 19, article VI[4] of the Constitution. (*Keim* v. *D. B. Berelson & Co.*, 105 Cal.App.2d 154, 158 [233 P.2d 123]; *Pomerantz* v. *Bryan Motors, Inc.*, 92 Cal.App.2d 114 [206 P.2d 440].)

There is no intimation in the court's remark of a sup-

"'The court may instruct the jury regarding the law applicable to the facts of the case, and may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the case. The court shall inform the jury in all cases that the jurors are the exclusive judges of all questions of fact submitted to them and of the credibility of the witnesses.'"

pression of evidence. The case of *Keena* v. *United Railroads,* 197 Cal. 148, 158 [239 P. 1061], is not pertinent. It actually did involve the suppression of evidence by an attorney.

## III.

The court's simile, likening a surgeon's medical assistant to a copilot on an airplane was not prejudicial. In the course of the cross-examination of Dr. Sullivan by respondents' counsel, the following occurred:

"Q. You're familiar with her case? A. Yes.

"Q. And you assisted in the second operation? A. That's right.

"Q. And from the record of the first operation, as you saw it, you know there was no assistant surgeon? A. I knew what the surgical team had been at the first operation.

"Q. Now, just a minute. You knew there was no doctor other than Dr. French in that room; that is clear, isn't it? A. That's correct.

"Q. And on the second operation, you were present? A. I was present.

"Q. Now, the duties of the assistant surgeon in there—— the surgeon works on that side. The assistant says, 'Doctor, you missed this artery' or the doctor says, 'Doctor, you reach over and get that. I can't reach it from where I am.' Isn't that right? A. You're not told to do that. You do it automatically.

"Q. In other words, the other doctor is there to check up anything that he missed, and to assist? A. Yes.

"Q. Now, a second doctor is there also in case of any untoward event that may happen to the patient or the doctor performing the operation, is that right? A. That would be one of the assistant's functions.

"Q. And the doctor could have a heart attack, something happen to him, the patient is opened up. He'll bleed to death if nobody else is there to take over won't he?

"Mr. Smith: Is that a statement or a question?

"Mr. Burns: I'm asking you.

"A. You describe a surgeon dying. I didn't get the question.

"The Court: He wanted to know why the assistant one was there.

"A. Yes, one of the reasons of the assistant is to help in any situation that may develop.

"The Court: Like a co-pilot on an airplane."

By reason of the court's simile, appellant contends that he was prejudiced; that the jury was not given a free rein to determine the facts. There is nothing in the court's simile calculated to harm appellant's case. ■■■ Had appellant thought so, he should have presented his grievance to that court by motion to strike. Having failed to do so, he waived objection to the simile. (*Crooks* v. *Glens Falls Indem. Co.*, 124 Cal.App.2d 113 [268 P.2d 203].) Appellant's criticisms of the court's other remarks are equally without justification.

## IV.

Appellant assigns as misconduct certain remarks of respondents' counsel in his address to the jury. They are all set out in the margin.[5] In support of his assignment, appel-

---

[5] [Argument by plaintiffs' counsel.]

"Now, ladies and gentlemen, Dr. Pearman has been produced by the Defendants. He is a member of the local medical society, and the doctors, as you know, all stand by each other. This case has been extremely difficult, not only because of the social and humiliating aspects and embarrassment, but also because, ladies and gentlemen, it is practically impossible to bring one of these suits and get a doctor to testify. They just simply will not do it; and it's a combine, don't think it isn't. It's a very close combine. As we stated to you before here, and before the Court, we could not even get her personal doctor to testify in this case."

"Yes, there is a combine, and no thanks to it, as Mr. Brazil would say. It's good for the doctors, but not good for the patient. There have been people who have taken them on, if you read the papers. Our governor, who just retired, took them on, and he had to quit and not run again. He had to say that he would not run for the next term. You have read the papers, you know what he tried to do. You know too in the papers and advertising and the contests that go on, how serious it is. You know or are acquainted with the magazines. Why, even this month, after this case is over, read the Cosmopolitan, October issue, on this very thing.

"Who is going to fight it? The head of the American College of Surgeons, Paul Hawley, the head of the whole United States American surgeons, got up and said there's got to be somebody in the profession do something.

"Mr. BRAZIL: Just a moment. Your Honor, that is going out of the evidence and out of the case. I assign that as prejudicial misconduct, and ask that counsel be admonished to refrain from those remarks. He is quoting something that is not in evidence, if it exists at all.

"THE COURT: Well, I think——

"Mr. BURNS: Matters of common knowledge, the jury, as I understand, Your Honor, can take into consideration.

"Mr. BRAZIL: Not newspaper articles or other articles.

"THE COURT: Well, I simply have to admonish the jury that they must consider the evidence alone. It's hard to tell sometimes, when arguments occur, what is proper argument and what isn't. That occurs both ways, but I will just simply admonish the jury that they must decide this case solely upon the evidence."

"We have to get a doctor that conforms to the same community or a

lant cites *Keena* v. *United Railroads, supra*; *Weaver* v. *Shell Co.*, 13 Cal.App.2d 643 [57 P.2d 571]; *Weaver* v. *Shell Oil Co.*, 129 Cal.App. 232 [18 P.2d 736]; *Deibler* v. *Wright*, 119 Cal.App. 277 [6 P.2d 344]; *Peacock* v. *Levy*, 114 Cal.App. 246 [299 P. 790].

After the close of testimony and before the remarks quoted on the margin, the court admonished the jury at length that the attorneys would present *their version* of the evidence. "Now, anything that counsel says or his quotation of the evidence, or his understanding of the evidence which departs from the testimony and the evidence as presented here is, of course, not to be considered by you, because the only evidence that you can decide this case upon is the evidence

---

similar community. Does anybody else in our society have a deal like that, where standards are made like that?''

''Any time a doctor ever testifies on behalf of a plaintiff, ladies and gentlemen, the testimony is waiting for the next trial he ever testifies in. And that was here immediately, because Dr. Kirkle had testified once. Just think of the power, of the interest, of the extent to which they go to cut down anybody who will dare place a finger at them.''

''Who is going to stop you being maimed and injured, and expenses running up, with your hard-earned money winding up in Cadillacs and big properties, where people will come into town in a few short years and all of the earnings of the community are converted into pain and agony for profit?

''Just think back and reflect a little bit. Here in 1946 Dr. French comes in and takes the hospital. He is in Paso Robles; he is in Cayucos. He's got a staff over here, he's got a hospital, and so forth. Can you do it in any other business?''

''And that is the plot which we have here against power.''

''. . . so that nobody has any edge, nobody has any power, not any business has the favoritism, the unjust, the very corrupt rule that these people have here against you. And it is against you and everyone, because your position can be changed and reversed by a slight misfortune in a hospital. It should be wiped out.

''Many lawyers are to blame for a lot that exists. It should not exist.''

''At that time, there was discussion about Dr. Oberson. I said, 'We can't get him here.' ''

''Anybody can bring him in, anybody concerned. Now, do you think that Dr. Oberson here, a member of this medical fraternity, hasn't been consulted? Don't you think that he doesn't know the shortness of that? And when I was in the position that I was in, I called here for your help; I said, 'We'll make an offer,' and when counsel stands here and tells you that there is a rule of law——

''MR. BRAZIL: Just a moment. If your Honor please, now, that is misconduct, and if he wants to argue that we'll argue it. It's absolutely improper. The Court has instructed him with reference to that matter, and this is absolutely misconduct.

''MR. BURNS: I haven't argued anything.

''MR. BRAZIL: You certainly have. You stated you made an offer, and it was definitely stated by the Court there was to be no comment . . .

''MR. BURNS: Ladies and gentlemen of the jury, you mark your recollection. Mr. Smith stood here and told you that there was a rule of law that, where evidence is available to a party and he doesn't produce

actually presented to you from this witness chair. . . . In the final analysis you are the ones who are going to interpret the evidence . . . and to decide the case as you see fit from the evidence presented.''

But the judge did not rest with that caution. During the course of the argument he intervened to say: ''Well, I simply have to admonish the jury that they must consider the evidence alone . . . they must decide this case solely upon the evidence.'' At one time the court said: ''Well, I have informed the jury time and time again that the repartee between counsel is not to be considered as evidence. We just expect a certain amount of that.''

Finally, in his formal charge to the jury, at appellant's request, the judge said:

''You shall not consider as evidence any statement of

---

it, it is presumed against him. They had Dr. Oberson available. He is a member of their society. If that wasn't true, you would have the evidence. All confidential relationships don't exist. I told you here that we couldn't bring him in. I told you the situation. I made the statement in front of you, here in open Court, and when counsel tells you that you can presume it was against them, use the rule as he wants you to use it, use it as he asked you to use it, because the powers of the Court are available to him, and you know that we are not connected with the medical fraternity, and you know the difficulty we have had.''

''. . . when I say a combine, I'm not talking anything short of the solid combine against a person.

''You have been to carnivals. Let me give you an illustration of just what it is, and believe me now, for going on 20 years, I have been (around it. You have been in a carnival or a circus where one of the patrons probably had been defrauded, and he starts to make a complaint and he wants to call the officers. You hear the guy holler 'Hey Rube,' and the whole circus come and practically beat him to death. That's what we are, we are the rube here, the rube here from beginning to end, ladies and gentlemen of the jury; and we are asking your protection.''

''. . . It's like a case I had in Sacramento one time where the PG&E strung a wire low and violated the law, and a man on a farm had his equipment, and his equipment was fixed to rely on that, and he was electrocuted and he died, and he had a family, a wife and children. And the lawyers of the PG&E sued him for the amount of electricity that had electrocuted him. Well, you should have heard the result from the jury, when that was——

''MR. BRAZIL: Your Honor, I hate to interrupt, but will Your Honor advise this jury that Dr. French never sued the Gists, and Mr. Burns knows it, if he's—let's have the facts. The only claim is that counterclaim.

''THE COURT: I think the facts are that there was no suit filed by Dr. French, but after suit was filed by the Gists there was a counterclaim.

''MR. BURNS: That's right . . .''

''. . . Don't you believe that that artery was not tied? What other reason can there be? It's puzzled everybody. It's puzzled His Honor, and if there was anything existed in reference to blood, you would have a blood man on here that would tell you; we were waiting, and there isn't anything there, there isn't anything.''

counsel made during the trial, unless such statement was made as an admission or stipulation conceding the existence of a fact or facts.

"You must not consider for any purpose any offer of evidence that was rejected, or any evidence that was stricken out by the court; such matter is to be treated as though you never had known of it.

"You are to decide this case solely upon the evidence that has been received by the court, and the inferences that you may reasonably draw therefrom, and such presumptions as the law deduces therefrom, as noted in my instructions, and in accordance with the law as I state it to you." B.A.J.I. 23.

Much of the temper and disagreement of counsel arose over appellant's counsels' accusing respondents for not producing Dr. Oberson who was currently caring for Winnie Gist. This, they asserted, was suppressing evidence. Such accusation was not warranted. (*Winkie* v. *Turlock Irr. Dist.*, 24 Cal.App.2d 1, 7 [74 P.2d 302].) Dr. Oberson was available to either side. He had no connection with either operation; hence, there was no confidence involved. Because Dr. Oberson and the witness X were both available to appellant, much of the argument with reference to the suppression of evidence could have been avoided by his bringing them into court. It was not the duty of respondents to do so.

The language of respondents' counsel of which appellant complains pales beside that of appellant's attorneys. They opened all valves and stoked the furnace. They invoked glamorous adjectives, accused their adversaries of villainy and charged the adverse witnesses with perjury and depravity.[6] (*Peacock* v. *Levy*, 114 Cal.App. 246 [299 P. 790]; *Bandoni* v. *Walston*, 79 Cal.App.2d 178 [179 P.2d 365]; *Pennix* v. *Winton*, 61 Cal.App.2d 761 [143 P.2d 940, 145 P.2d 561].)

In *Pennix* v. *Winton, supra,* the judgment was reversed by reason of the scurrilous attack of defendant's counsel upon the plaintiff. In *Bandoni* v. *Watson, supra,* an action for

___

[6][From argument of Appellant's Counsel]

"By making those statements which are groundless and baseless and slanderous and unsupported by the evidence, ladies and gentlemen, they succeeded in poisoning your minds against Dr. French or any of the defendants."

"But that is proof of the situation, of the attitude and frame of mind of the planner of this action."

". . . because it shows the plan and the scheme . . ."

"What evidence do they have? We have the plans by Burns; we have

damages for failure to deliver shares purchased, the judgment for plaintiff was reversed because his counsel persisted in urging the jury to draw certain inferences from irrelevant evidence and the court had supinely declined to ask the jury to disregard his argument. In *Keena* v. *United Railroads,* 197 Cal. 148 [239 P. 1061], the judgment was reversed because counsel for plaintiff, without cause, accused defendant of having suppressed evidence. In *Gackstetter* v. *Market Street Ry. Co.,* 130 Cal.App. 316 [20 P.2d 93], the judgment was reversed because of implied charges that defendant had attempted to suppress evidence. In view of the withering blasts poured out by appellant's counsel, there is no merit in their complaint as to the arguments of respondents' counsel upon facts from which fair deductions could reasonably have been drawn.

It is unfortunate that a lawsuit, sounding in tort, could not be tried before a jury without resort to opprobrious epithets and accusations of crime. Zeal of contest should not be considered as excuse for such language. Lawyers know that the merits of a cause should not be adjudicated on the basis of which advocate can, with impunity, make the most vicious attack on his adversary. There is room enough for the display of eloquence, imagination and phraseology in a contest such as that under consideration that would not divert the attention of the jurors from the issues to persons. The question on trial was whether appellant was guilty of

the proof by Kirkle. That is your picture. Whether he be a doctor, Kirkle is a demonstration beyond peradventure of a doubt, which they cannot get away from no matter how much he talks, of the type of evidence which they are willing to present to you to secure a judgment against a man with the standing of Dr. French.''

''And that's the man they put on the stand to ask you to give a judgment in favor of the plaintiff.''

''Just think—a professional man getting on the stand under oath before a jury like this and the audience that was there, and saying he had his wife dressed up as a nurse so that ,people wouldn't talk when he examined a female patient. What do you think of that? And that is the man that they are pitting against Dr. French and Dr. Pearman and Dr. Sullivan and Dr. Wolfe.''

''He is not entitled to any consideration, and I can't say too much against the depravity of a man like that—a fraud and a perjurer, that's what he is.''

''If he testified as he did in San Jose and as he did here with reference to these operations, it seems the record discloses he would testify to anything that was necessary to make out a case for the plaintiff.''

''. . . because if there are Kirkles and Kirkles, then the doctor is at the mercy of that kind of an individual, scheming without any consideration of the truth, and honesty and integrity, to get on the stand under oath and blast a doctor for a consideration.''

incompetency and neglect; not how bad is "the big bad wolf." It is not unlikely that the jurors would have glided into a state of disagreement but for the firm, judicial behavior of Judge Lyon.　　　The fervid and vicious attacks by appellant's counsel require that no further comment be made upon the subject. They entered into each controversy with a vengeance; at the time, they made no motion to strike the statements they now urge as prejudicial, took their chances on a victory and now ask a reversal. That is not the approved foundation for a successful appeal. (*Aydlott* v. *Key System Transit Co.*, 104 Cal.App. 621, 628 [286 P. 456].)

　　　There was no prejudicial error in instructing the jury that they could find appellant guilty based on the asserted negligence of Dr. Wolfe or Dr. Sullivan after the two had been nonsuited. The court instructed the jury as follows:

"You are instructed that an employer is responsible to third persons for the negligence of his employee or employees in the transaction of the business of the employment, including negligent acts committed by such employee in and as a part of the transaction of such business. In this case, therefore, the defendant Hospital is liable for the negligence, if any, of its employees or servants acting within the scope of their employment or in the transaction of the business of the defendant Hospital, *and this includes Doctor Sullivan and Doctor Wolfe as employees of defendant.*" (Italics added by Appellant.)

Such instruction is the law of California. (Civ. Code, § 2338; *Ybarra* v. *Spangard,* 25 Cal.2d 486, 492 [154 P.2d 687, 162 A.L.R. 1258].)

Because the action had been dismissed as to Sullivan and Wolfe, appellant argues (1) that the instructions with reference to their alleged negligence were calculated to mislead the jury; (2) that they are not supported by any evidence, citing *Davenport* v. *Stratton,* 24 Cal.2d 232, 254 [149 P.2d 4]; *Chapman* v. *Pacific Electric Ry. Co.,* 85 Cal.App. 69, 74 [258 P. 1006].)

The court took pains to impress the jury that, by dismissing the suit as to Drs. Sullivan and Wolfe and Nurse Stokes, no inference should be drawn "that the court has decided, or has formed or expressed an opinion, that a case against Dr. French has been established. That is a matter for the jury to determine under the evidence and under the rules of law stated to you in these instructions." Also, in his general charge, the judge laid out the law with reference to the

doctors who were in the employ of appellant.[7] He thereby told the jury that where a group of physicians undertake to treat a patient, each is required to use that degree of skill and learning ordinarily possessed in the community where the treatment was administered or in similar communities, but they might find that one or more of such doctors did use such degree of skill and learning while others did not. In other words, the jury might find that any one of the several physicians was negligent and a verdict might be returned against him only.

The court had granted a nonsuit to Sullivan and Wolfe for the reason that they were appellant's employees and all they did was to obtain information for him and enter it on his record which he read and from which he gave his directions. Rightly or wrongly, the court concluded that there was not sufficient evidence to warrant a judgment against the two physician-employees. At any rate, appellant's counsel, on behalf of all defendants, moved for a nonsuit, urged the court to grant it, and it was granted as to three of their clients. After removing three of their own clients from the scene, why should they now be permitted to take advantage of their own tactics by getting a judgment for their fourth client who was the employer and actually did all the cutting on Winnie Gist? A tort feasor cannot take advantage of an error in favor of his codefendants. Their liability is joint and several. (*Hedlund* v. *Sutter Medical Service Co.*, 51 Cal.App.2d 327, 335 [124 P.2d 878].)

That the services of Wolfe and Sullivan were of secondary importance is made clear by the statement of appellant's counsel in his argument to the jury as follows: "It seems to me, ladies and gentlemen, that this case boils down, aside from all personalities as such and aside from all contentions of the parties, it boils down to the question—one of them Mr. Buck stated—did Dr. French tie the vaginal branch of the left uterine artery which was later found hemorrhaging on March 8th? Did he, on the first operation, tie that artery?

---

[7] "Where a number of doctors engage in the care and treatment of a person, each individual doctor in any treatment given by him or any act done by him, must, in the giving of such treatment, or in doing of such act, exercise reasonable and ordinary care in applying that degree of learning and skill ordinarily possessed by doctors of good professional standing in the same or similar localities and under similar circumstances, and if you find that any of these doctors, or all of them, failed to use that degree of learning and skill as aforementioned, and that as a result of such failure the plaintiffs sustained damage, then you must bring in a verdict for plaintiffs."

That is one question. The next thing is, did he, in the second operation cut off and shorten, as Dr. Kirkle claims, the upper part of the lady's vagina? Now, there is the question.''

Also in his argument to the jury, respondents' counsel had said: ''So the case is going to come down closely to, first, whether or not the artery was tied off in the first operation, and whether or not she was negligently treated in the hospital subsequent thereto, and as a result thereof had to undergo a second operation with the result that her ovary and tube were taken out, and leaving her in a condition which she had been in, and in which she is now.''

From such language, it is clear that the parties were in agreement that the issues were: (1) Did Dr. French in the first operation tie off the vaginal branch of the left uterine artery with ordinary care; (2) did he, in the second operation, cut off and shorten the upper part of the vagina? From the evidence, as it appears in the record, the court wisely decided that while the jury might find that Wolfe or Sullivan negatively did some act in the course of their service to appellant, after all, the two operations had been performed by appellant and it would not be justice to saddle a judgment onto his helpers. He admitted his failure to tie off the severed artery.[8]

There is no substantial error in the instructions complained of; no prejudice resulted to appellant by reason thereof. ██ Where the judgment is just and in accordance with the facts found, it should not be reversed even though erroneous statements of the law might have been made. (*Quinn* v. *Quinn,* 81 Cal. 14, 19 [22 P. 264].) There is not a chirp from appellant that Winnie Gist's health and bodily powers have not suffered a collapse as a result of the operations. ██ While the proof shows that the cutting was done by appellant, it is the law that if his employee, in the course of employment, negligently did an act that contributed to the suffering or deterioration of Mrs. Gist, appellant is liable therefor.

---

[8] *Mr. Gist's testimony*: ''I knew that Miss Stokes knew what had happened. She told me then that Dr. French had told her that they failed to tie off an artery in the first operation; that it was hemorrhaging and they had to open Mrs. Gist up again and tie the artery off and he had taken out the rest of the organs. I told Dr. French I had talked to Miss Stokes and that she had told me that he had failed to seal off an artery cut during the first operation. He said something on that order had happened; it happens in a hundred or two times. When I started to ask him about the organs, he turned around and left me.''

## VI.

It is contended that prejudice resulted to appellant by the admission of evidence of lack of consent to the removal of her organs and by the refusal to instruct the jury that the issue of lack of consent had been removed from the case by reason of the evidence and the law.

■ Even if such evidence of lack of consent was admitted, how could it be prejudicial in view of appellant's stipulation that she gave no consent to either operation? Signing of a consent by Mrs. Gist was no longer in issue. ■ But her inquiries as to whether appellant told her where the tumor was and whether he told her what he had decided to remove, were admissible under her first count. Such inquiries were proper under her allegation that appellant was employed ''to attend, care for and treat her for the removal of a tumor for compensation to be paid therefor''; also, for the reason that appellant was charged with malpractice in his surgery and treatment of his patient. Appellant argues that there is no evidence that either operation was unnecessary or improper. ■ The opinion of an expert on whether it was necessary to remove the genital organs and appendix of a healthy woman is not necessary where the evidence of her condition prior to the operation was before the jury. ■ But this is a side issue. The main contention before the court was that appellant negligently failed to tie the artery at the first operation, so unnecessarily removed her ovary and shortened her vagina in the second operation as the result of the blood erosion. There was no evidence that the removed ovary or appendix or vagina had any malignancy requiring excision! In the absence of such proof, the jury were competent to determine whether such acts were malpractice.

The court properly rejected appellant's special instruction 31A.[9] It failed to declare that the emergency obtaining on March 8 had arisen by virtue of the acts of appellant on February 25. ■ Surely a surgeon cannot negligently

---

[9] ''You are instructed that under the law and the evidence in this case it has been established beyond question that Dr. Edison A. French had the permission and consent of the plaintiffs, Winnie Gist and Fred Gist, to remove the appendix, the entire uterus, including the cervix, in the first operation and the left ovary and left tube of Winnie Gist in the second operation and that it was his duty under the evidence in this case to remove said organs when he did. Such consent need not be in writing;

''The only question therefore for the jury to decide is whether there

create a pathologic condition in a patient and then for a second time operate to rectify his former error, without the consent of such patient and without first advising her how it happened.

No person may take advantage of his own wrong. Proof of appellant's negligence was properly admitted and the submission of the question of appellant's liability for such damages as his negligent acts caused, was the correct course for the court. The jury was empaneled to try that very issue.

## VII.

Appellant contends that it was prejudicial error to allow Dr. Kirkle to testify; that, having testified that he had never operated in San Luis Obispo, he was not qualified to determine that he was "familiar with the degree and standards of care normally exercised by a reputable physician in good standing in a comparable situation, and faced with a comparable operation as that performed on Mrs. Gist." Dr. Kirkle had practiced in the counties containing Lodi, Los Angeles, Napa, Alturas and Sacramento. Appellant contends that there was no proof "that standard practice in those communities was the same as the standard in San Luis Obispo or that those communities were similar to the community of San Luis Obispo relative to the standards of medical and surgical care and practice." Indeed, Dr. Kirkle did testify that the standards in all five counties are the same.

But the contention of appellant is archaic. It was not without merit in former days when distances were great and the mode of travel was in keeping with muddy lanes, swollen streams and impassable mountains; when the means of communication were restricted to handwritten letters; when medical journals were rare and their contents were largely concerning personalities. Today the discoveries of insulin, iron, quinine, strychnine or the antibiotics is instantly heralded throughout the civilized world and as speedily communicated are the methods of administrating them and the symptoms for which they are to be applied. Every great hospital in the land maintains systems for preserving statistical information relative to the treatments of diseases and injuries, much of which is published to the medical world in attractive journals,

---

was any negligence on the part of Dr. French in his treatment and care of the plaintiff, Winnie Gist, which was a proximate cause of injury and detriment to the plaintiffs. In this further connection you are instructed that negligence, even if proved, is of no consequence whatever and will not support a verdict against anyone unless it is also shown to have been a proximate cause of an injury complained of."

whereby practitioners are equipped immediately to utilize the new remedies. The same is true with respect to all new methods and devices of the surgical art. The ubiquity of such knowledge, the popularity of ethical standards in every part of the nation and the uniformity of curricula in medical schools have combined to create one community of medical practitioners out of the 48 states and the District of Columbia. Surely, a surgeon in San Luis Obispo has acquired practically the same knowledge of surgery that is practiced in both San Francisco and Los Angeles. Appellant was educated in the same schools of medicine with Dr. Kirkle who has enjoyed a contemporary practice in California communities similar to San Luis Obispo. If a surgeon in a coast town does not maintain the same ethical standards as do surgeons of the two more populous cities, it is not because the standards have not been established there, but rather because of his lack of interest in his work, or he is negligent in performance.

The law requires of surgeons and physicians only that they possess and exercise that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances. An expert doctor-witness must have had basic educational and professional training as a general foundation for his testimony and, in addition, he must have a "practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confronted the defendant charged with malpractice." (*Sinz* v. *Owens,* 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757] ; *Huffman* v. *Lindquist,* 37 Cal.2d 465, 478 [234 P.2d 34, 29 A.L.R.2d 485].) In the Sinz case, the court said : "The duty of a doctor is not fulfilled merely by utilizing the means at hand in the particular village where he is practicing . . . the borders of the locality and community have, in effect, been extended so as to include those centers readily accessible where appropriate treatment may be had which the local physician, because of limited facilities or training is unable to give." In *Huffman* v. *Lindquist, supra,* the court held that while the witness must have had educational and professional training, "it is a practical knowledge of what is usually and customarily done by physicians *under circumstances similar* to those which confronted the defendant charged with malpractice that is of controlling importance in determining competency of the expert." In other words, the principal qualification of a witness to qualify as a medical expert is "occupational

experience'' which has been gained steadily and adequately in the course of his practice. Such experience may be gained by a physician in Napa and Sacramento, or in the large cities as well as in San Luis Obispo. (See our recent decision in *Agnew* v. *City of Los Angeles*, 134 Cal.App.2d 433, 436-438 [286 P.2d 556].)

Not only was Dr. Kirkle educated in the same medical school where appellant graduated, but he has practiced in California towns since 1934, with considerable experience in hysterectomies. He was familiar with the methods and standards of practice and of care commonly pursued by reputable physicians under circumstances similar to those that beset appellant on February 25, and March 8, 1952, when the techniques of operations on the organs in the pelvic area were uniform throughout California. Moreover, appellant admitted not only his membership in the several hospital associations of California, but, also that the standard of surgery in San Luis Obispo is not below that of larger cities. In view of such admissions, and of the witness's experience in medical and surgical practice, it cannot be said that the trial court abused its discretion in holding Dr. Kirkle competent to testify. (*Mirich* v. *Balsinger*, 53 Cal.App.2d 103, 114 [127 P.2d 639] ; *Huffman* v. *Lindquist, supra*, p. 476.) Having qualified, in the court's discretion, the value and effect of his testimony was solely for the appraisal of the jury. (*Chan* v. *Title Ins. & Trust Co.*, 39 Cal.2d 253, 258 [246 P.2d 632].)

Conceding that the requirement for a medical expert that he must have knowledge of the standards of care of the community where the negligent act of the defendant was performed, it is not to be understood that ''community'' means a village or a section of town; but rather, it means such an area as is governed by the same laws, and the people are unified by the same sovereignty and customs.

## VIII.

Appellant contends that he was prejudiced by Dr. Kirkle's testimony in testifying what he would do under prescribed conditions and in testifying that appellant did not use ordinary care. He selects a number of questions[10] addressed

---

[10] ''Q. In a hysterectomy, elective hysterectomy surgery, is it good practice to perform the operation without an assistant M.D.?

''Mr. Smith: We object to that, if the Court please, as being immaterial.''

''Q. And, Doctor, do you as a doctor interested in the patient and

to the witness some of which are contained on the margin. He now for the first time raises the objections (1) that the answers given did not relate to the standards of medical and surgical practice in the locality of San Luis Obispo; (2) that the testimony relates solely to what Dr. Kirkle himself would do; (3) that the court allowed the witness to testify that appellant failed to use ordinary care, which was "an invasion of the province of the jury."

The difficulty with that contention is that the principal objection to such questions was that it was immaterial; secondly, that some questions did "not assume sufficient facts upon which to base an intelligent medical opinion and is not in accord with the evidence in this case." It was then stipulated that the same objection would go to all questions directed to the witness. No objection to questions propounded to Dr. Kirkle was based upon an "improper hypothesis" or upon the point that the inquiries were as to what Dr. Kirkle would have done instead of what a physician reasonably well informed and skillful would have done under the same circumstances. Therefore, by not including such matters in the questions, appellant waived his right to object on those grounds and cannot raise them on appeal. (*Buck* v. *Hill,* 121 Cal. App.2d 352, 359 [263 P.2d 643]; *Satariano* v. *Sleight,* 54 Cal. App.2d 278, 282 [129 P.2d 35].) The trial court is not required to dissolve every question to ascertain whether it is covered by a blanket objection, leaving the appellant absolved from the necessity of objecting to the relevancy or competency of a question and placing the responsibility on the trial court to discover some possible vice in the interrogation. Objections to evidence must be clearly made at the time of the offer and if not so made, the ruling cannot constitute a basis for reversal. The grounds now assigned as errors of the court may not cure appellant's failure to object to the questions and answers at the time. (*Hatfield* v. *Levy Bros.,* 18 Cal.2d 798, 809 [117 P.2d 841].)

The attack upon the several questions set forth in the last footnote above has no force in view of the fact that at other times in the course of trial, respondents' expert witness established under proper hypothetical questions that appellant

the postoperative care and treatment of the patient under those circumstances *what would you then do as a doctor?*

"A. Investigate.

"Mr. Smith: Same objection, if the Court please, on the same ground."

did not in treating Mrs. Gist, exercise the standard of care used by a reasonably educated and experienced physician in a similar situation in operating without consulting both respondents, in not advising them of the location of the tumor and what was to be removed; in operating without the aid of an assistant surgeon; in failing to tie off the vaginal branch of the left uterine artery; in shortening the vagina; in not recognizing and appraising the bleeding artery and the wasted blood in the pelvic cavity; and in not calling upon Mrs. Gist at her home after February 28.

As to "what Dr. Kirkle would have done" in each of the situations presented, it is recalled that the witness first qualified as a reasonably well-educated, experienced and prudent physician. Hence, what he would have done in each situation presented to him in a question was what would he, as a reasonably well-educated, skillful and experienced physician, have done. Such questions were not required to be in the form of a hypothetical question. (*Thompson* v. *City of Long Beach*, 41 Cal.2d 235, 242 [259 P.2d 649] ; *Estate of Gore*, 119 Cal.App.2d 796, 799 [260 P.2d 859].)

## IX.

Appellant was not prejudiced by the court's rejection of Special Instructions as follows:

[x] "A physician, or surgeon, is not liable for malpractice unless he has done something in the treatment of the patient which recognized standards of medical practice in the community forbid in such cases, or has neglected to do something required by such standard."

[y] "Before a physician, or surgeon, can be held liable for malpractice he must have done something in his treatment of his patient which the recognized standard of good medical practice in the community in which he is practicing forbids in such cases, or he must have neglected to do something which such standard required. In this connection you are reminded that any act or omission is of no importance unless it is a proximate cause of an injury complained of."

The matters contained in the offer [x] were covered by instructions given by the court. Hence no prejudice could have resulted from the court's not giving the requested instructions. (*Rednall* v. *Thompson*, 108 Cal.App.2d 662, 668 [239 P.2d 693].) With reference to the second instruction [y], respondents were obliged to show by a preponderance of the evidence that appellant violated the standard of

medical practice which he was required to uphold. Appellant requested and the court gave the following which answered all purposes, to wit:

"The law has never held a physician or a surgeon liable for every untoward result which may occur in medical practice. It requires only that he shall have the degree of learning and skill ordinarily possessed by physicians of good standing practicing in the same or similar localities, and that he should use ordinary care and diligence in applying that learning and skill to the treatment of his patient.

"In determining whether defendant's learning, skill and conduct fulfilled the duties imposed on him by law, as they have been stated to you, you are not permitted to set up arbitrarily a standard of your own. The standard, I remind you, was set by the learning, skill and care ordinarily possessed and practiced by others of the same profession in good standing, in the same or similar localities, at the same time. It follows, therefore, that the only way you may properly learn that standard is through evidence presented in this trial by physicians and surgeons called as expert witnesses."

## X.

No prejudice resulted from the instruction to consider the changed value of the dollar in assessing damages.

The court gave the following instruction:

"If your verdict is in favor of plaintiffs you may take into consideration, in assessing the damages, the fact that the value of money has materially changed from what it was some years ago. The value of the dollar has materially decreased during that period. There has been a corresponding increase in wages and salaries as well as in the cost of living in all walks of life. If you find in favor of the plaintiffs, the amount of your verdict should be based upon the present value of the dollar—that is, its value at the time of the verdict."

There was no error in giving such instruction. It told the jury of laymen that any damages assessed should be based upon the present value of the dollar. It is plain common sense and simple honesty for a court or a jury in appraising the damages suffered by reason of any tortious act of defendant to compute the amount of damages according to the current value of the dollar. (*Burke* v. *City & County of San Francisco,* 111 Cal.App.2d 314, 320 [244 P.2d 708]; *Duvall* v. *T.W.A.,* 98 Cal.App.2d 106, 111 [219 P.2d 463]; 12 A.L.R.2d 611, 645, annotation.) The dollar is merely a

medium of exchange. Its value is fixed by the current values of things that are bought and sold. Hence, in appraising the loss suffered by reason of the act of a tort feasor, its value should be determined by the current value of the dollar in the commercial world.

## XI.

No prejudice resulted from the combined force of the alleged errors. It is contended that since the "evidence is uncontroverted that it was necessary, at the first operation, to remove the uterus, cervix and appendix, the awards must relate to the other elements of claimed damages."

 The fixing of the amount of damages to be awarded for an injury caused by a tort is a duty devolving upon the jury, or upon the court sitting without a jury. When the jury has assessed the damage and the trial judge has impliedly approved the award, the reviewing court may not interfere, unless, from a review of the record, it is convinced that the verdict is the result of passion or prejudice. (*Duvall v. T.W.A., supra.*)

In view of the many questions involved in the trial, of the virulence of the antagonists before the court and of the necessary confusion resulting, the trial judge is to be commended for the clarity and wisdom with which he met the situations that confronted him. There is no prejudicial error in the record.

The judgment and the order denying the motion of defendant for judgment notwithstanding the verdict are affirmed.

McComb, J., and Fox, J., concurred.

On October 18, 1955, the opinion and judgment were modified to read as above. Appellant's petition for a hearing by the Supreme Court was denied December 14, 1955.